## Ross v. Oliver Bros. & Honeycutt

(Decided February 25, 1913.)

### Appeal from Jassamine Circuit Court.

1.  Contracts—When Party Estopped to Say He Did Not Know Contents of Paper He Signed.—It is a general as well as a sound rule that a party who is in the full possession of his faculties and who is able to read, will not be heard to say that he did not know the

contents of a paper which he signed and which he had ample opportunity to read and understand.

2. Contracts—When Party Not Estopped to Attack Contract He Signed.—When the evidence shows that the complaining party relied upon the representations made to him by the party producing the paper as to its contents, and the conditions surrounding him are such that a person of ordinary prudence could not be said to be negligent in failing to read and understand for himself, he will not be estopped to question its validity by the fact that he trusted to his adversary.

3. Contracts—Signed on Sunday—When Not Void.—The mere fact that a contract is signed on Sunday does not affect its validity if some essential thing in connection with it, or that is necessary to make it effective between the parties, is done, or remains to be done on some other day.

4. Contracts—When May Be Avoided on Ground of Fraud or Lack of Capacity to Understand—Instructions.—If a party at the time he signs a contract is imposed upon and deceived, and in fact defrauded, he has a right to assail its validity, although his mind is not enfeebled, and if his mental condition is such that he cannot know or understand the contents of the paper, this likewise furnishes him a good reason for attacking its validity, and an instruction that a party cannot avoid a contract unless it appears that he did not know its contents and was also mentally incapable of understanding them, is erroneous.

5. Master and Servant—Duty of Master to Keep Appliances in Repair —Liability for Failure.—When the duty of inspection does not devolve on the servant, and when he is not required to look out for defects and make repairs, it is the duty of the master to exercise ordinary care to furnish him with reasonably safe fixtures and appliances to work with.

E. B. HOOVER, ROBERT HARDING, EMMET PURYEAR, for appellant.

N. L. BRONAUGH, W. S. ROBERTS, for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

At the time the accident under investigation occurred the appellees were engaged in making a fill. The material used in the fill was obtained from nearby land and then loaded on cars and transported to the fill. In obtaining the material a steam shovel was used, which was operated by stationary engines, three of which were located some distance back of the shovel, and one near the boom from which the shovel was suspended. The engines back of the shovel were in charge of an engineer, and the one located at the boom was in charge of an employe known as a craneman; and the shovel was moved by chains that ran on pulleys over the boom.

The engine operated by the craneman was used for the purpose of forcing the shovel into the dirt and pulling it out when it was filled, while the other engines, operated by the engineer, were used for the purpose of lowering and raising the shovel and emptying its contents into the car. In the performance of this work, and when he was injured, appellant was the craneman and Couch was the engineer, both being employes of the appellees and also capable experienced men in the work they were engaged in.

While oiling one of the chains that was used to transfer power from the engines under the control of Couch to the shovel, appellant was struck on the head by the end of a chain that became unfastened from the shovel, and was very seriously injured. In this action to recover damages appellant charged that his injuries were caused by the defective condition of a bolt which permitted the chain to get loose, and also by the fact that the engineer, in running the chain so that it might be oiled, negligently applied more power than was necessary, thus causing the bolt to break.

In answer the appellees, after traversing the petition averred that it was the duty of appellant to oil the chain and to see that it was in proper condition, and to discover defects in it, and that while he was engaged in oiling it, the movement of the chain was interfered with by a bolt, and thereupon appellant, who saw what the trouble was, requested the engineer to give the chain a jerk, which the engineer did, with the result that the chain came loose where it was fastened with the bolt. They further averred that the craneman and engineer were fellow-servants and therefore they were not liable for any accident that happened to him by the negligence, if any, of the engineer; and also pleaded in defense of the action the following receipt executed to them by appellant:

"In consideration of the fact that Oliver Bros. & Honeycutt have assumed to pay and have paid all my expenses for physicians, for board and other expenses while confined at the hospital at Lexington, Ky., I hereby release them and the C., N. O. & T. P. Ry. Co. from any and all claims I may have against them by reason of the injuries I received while in their employment at or near High Bridge, Ky., on April 7, 1910, and all expenses from April 7th to April 25th, 1910."

In a reply the appellant, in avoidance of the receipt, averred that while he was unconscious in a hospital the appellees procured his signature to a paper which he supposed and believed to be a statement concerning the manner of his injury, and consenting that appellees pay the doctors they had employed, and that it was not understood by him to be a release of the liability of appellees for his injuries, and he received no consideration therefor, and made no contract or settlement releasing his claim for damages, and did not know until the appellees answered herein that it was claimed that any settlement had been made with him. He further averred that the receipt was a fraud upon his rights, and his signature thereto was procured without his being aware of the fact that the paper contained a release, and at a time when he was weak and nervous and sick and unable to comprehend or know the contents of any paper, or to make any contract, or to protect himself, or understand or know what he was doing. He further averred that the receipt was signed on the 24th day of April, 1910, which date was Sunday, the 7th day of the week and the Christian Sabbath, and that the appellant and appellees did not belong to any religious sect or denomination that observed any other day as a day of rest and for religious worship, and was in violation of law, and was procured by fraud.

The appellant, the only witness in his behalf as to the cause of the injury put the accident wholly upon the ground that while he was oiling the chain by direction of the engineer, his superior officer, the engineer in operating the engine, jerked the chain in such a negligent manner as to cause the bolt to break. He did not rely on any defective or unsafe appliances or fixtures but did say that it was not his duty to discover or look out for defects or to repair them.

The evidence for appellees was to the effect that it was the duty of appellant to oil and repair the chains and fixtures on the boom, as well as other parts of the machinery about the shovel and boom; and that a few minutes before the accident happened appellant asked if he would have time to oil the chains on the boom, and was told that he would, and thereupon, without direction from any one, he went up on the boom for the purpose of doing the oiling, and immediately afterwards he discovered that in some way the chain was caught and

would not run, and directed Couch, the engineer, to apply the power, which he did, and a bolt that fastened the chain came out, letting the end of the chain loose. It also showed that the tap or nut on the bolt had worked off, and this caused the bolt to come out.

In reference to the receipt the appellant, putting his evidence in narrative form, said: While I was in the hospital and in bed Dr. McLean brought a paper in there for me to sign, and I signed it. When Dr. McLean brought the paper to me he said he had a paper that he would like to get me to sign; that he had to make out a report to the railroad company and he wanted the paper signed so that he could get his pay, and I signed it. He did not read the paper over to me. Just told me in words. I could not read, as I was sick and nervous; and he did not tell me that it was a settlement of any claim I had or discussed with me the settlement of any claim. I signed the paper on Sunday, the 24th of April, and left the hospital the next day. I relied on what the doctor told me was in the paper, and would not have signed it if I had known it was a settlement of any claim for damages. I was in a very bad, nervous condition that day. My head was aching and paining me and I didn't know what was in the paper.

Dr. McLean said in substance that he was one of the physicians who attended the appellant, but that he did not see him many times while he was in the hospital. He said he was requested to take the paper appellant signed and give it to him, and that when he went into the room in the hospital where appellant was he said to him: "This is the agreement that Mr. Honeycutt wants you to sign to see that all your bills are paid." He read it and I left it with him and went out, and when I came back in a short while, he said, "It's all right; I will sign it," and I witnessed his signature. He had told me before I took the paper to him that he did not want to leave the hospital until his bills were paid, and I reported that fact to Oliver Bros. & Honeycutt, and as a result they handed me the paper to get him to sign it. When he signed the paper he appeared perfectly normal.

When the court came to instruct the jury he directed them in instruction No. 1 that "Unless the jury believed from the evidence that the written release dated April 25, 1910, exhibited and read in evidence to the jury, was

procured from the plaintiff by the defendants or some
one representing them, without the plaintiff knowing
or being aware of the fact that said writing contained a
release, and at a time when his mind was so enfeebled
that the plaintiff was unable to know or comprehend the
contents of the paper, and when he did not know or
understand what he was doing, the jury should find
for the defendants without regard to the other instruc-
tions.''

After the case had been submitted to the jury the bill
of exceptions shows that they returned into court and
reported that no verdict had been reached, whereupon
the court suggested that they ought to be able to make
a verdict, and asked them to give the case further con-
sideration. ''That as the jury were leaving the room,
Mr. Gormley, one of the jury, said to the court that
there was some disagreement among the members of
the jury as to the meaning of the first instruction to
them. The court then directed the sheriff to bring all
of the jury back into the room, and the entire jury re-
turned into the court room. When all of the jury were
back in the court room the judge asked what the ques-
tion was that the jury desired to ask him; whereupon
Mr. Gormley said the jury did not exactly understand
the first instruction. The judge then took the instruc-
tions and read aloud the first instruction, and after
reading it remarked that he didn't see how he could
make it any plainer. Thereupon Mr. Overstreet, one of
the jury, remarked that there were two clauses in the
instruction, one that if the plaintiff signed the release
without knowing what was in it, and the other that
if the plaintiff was of unsound mind, and that the jury
did not know whether or not they were required to
find both those states of fact. The court then took
the instruction and after looking at it said to the jury
that those two clauses were joined by the conjunction
''and,'' and that to relieve the plaintiff from the effect
of the release the jury must believe both. The jury then
returned to the jury room and within a very few minutes
returned into court and rendered their verdict.''

The verdict was for the defendants, now appellees,
and counsel for appellant ask a reversal of the judg-
ment entered on the verdict for assigned errors of the
court in giving and refusing instructions.

It will be observed that in this instruction the jury

were told in effect that they must find against appellant unless they believed from the evidence that the receipt was procured from him when he was ignorant of the fact that it contained a release and at a time when his mind was so enfeebled that he could not comprehend the contents of the paper or understand what he was doing.

Under this instruction, although the jury might have reached the conclusion from the evidence that the appellant signed the paper without knowing what it contained, they must nevertheless have found against him unless they further believed that his mental condition was such that he could not understand the paper even if he had read or heard it read. That this instruction played an important part in the deliberations of the jury is manifested by what occurred between the court and the jury, as set out in the bill of exceptions heretofore quoted, and if this instruction was erroneous in requiring the jury to believe the existence of both the facts noticed before they could return a verdict in favor of appellant it cannot be doubted that it was highly prejudicial.

The question then is, was it necessary that appellant should have been not only ignorant of the contents of the paper but so feeble that he could not understand its contents before he can be allowed to attack it. It is a general as well as sound rule that a party who is in the full possession of his faculties, and who is able to read, will not be heard to say that he did not know the contents of a paper that he signed and which he had ample opportunity to read and understand, Spitze v. Baltimore & Ohio Railroad Co., 75 Md., 162, 32 Am. St. Rep., 378; J. I. Case Threshing Machine Co. v. Mattingly, 142 Ky., 581. There are, however, many exceptions to this rule growing out of the circumstances surrounding the parties and the relations they sustain toward each other, and one of these exceptions arises when the evidence of the complaining party clearly shows that he relied upon the representations made to him by the party producing the paper, as to its contents, and the conditions surrounding him were such that a person of ordinary prudence could not be said to be negligent in failing to read and understand for himself the paper that he signed. When this appears the party signing the paper will not be estopped to question its validity by the

fact that he trusted to his adversary. Western Mfg. Co.
v. Cotton & Long, 126 Ky., 749.

And we think the circumstances surrounding the appellant at the time he signed this paper are sufficient to bring the transaction within this well recognized exception to the general rule before stated. The appellant was just recovering from a desperate injury, and at the time was confined to his room in the hospital. The party who produced the paper to him was one of his attending physicians who was acting as the agent of appellees, and appellant can not be said to have been negligent or lacking in ordinary prudence when he accepted as true the statements of his physician as to what the paper contained without reading it for himself. He had the right to trust Dr. McLean and depend on the truth of what he said. That Dr. McLean deceived appellant as to the contents of the paper is made clear by the fact that although he knew its contents he testifies that he told appellant that it was an agreement that his bills would be paid, without telling him that it was also a release. In Page on Contracts, vol. 1, sec. 64, the principle we have laid down is thus stated:

"If the party defrauded could read, had a chance to read, and omits to read the instrument, relying on the adversary party's statement of its contents, the instrument should on principle be treated as void as between the parties thereto, since it should be no defense for the party committing the fraud to say that the other party was negligent in believing him. The majority of the courts take this view of such cases."

In Bates v. Harte, 124 Ala., 427, 82 Am. St. Rep., 186, the court in speaking to the point under consideration said:

"One who has signed a contract in negligent ignorance of its contents cannot, in the absence of fraud or misrepresentation, set up such ignorance in avoidance of the obligation. If he cannot read, due care for his own interest requires that he should have it read to him. If, however, his signature to the instrument, without knowledge of its contents, has been induced by misrepresentations concerning same, made by the opposite party, the fraud involved in such misrepresentations will furnish a defense to an action based on the purported undertaking."

In Maxfield v. Schwartz, 45 Minn., 150, 10 L. R. A., 606, the court said:

"While in the ordinary business transactions of life men are expected to exercise reasonable prudence and not to rely upon others with whom they deal to care for and protect their interest, this requirement is not to be carried so far that the law shall ignore or protect positive intentional fraud successfully practiced upon the simple-minded or unwary. As between the original parties, one who has intentionally deceived the other, to his prejudice, is not to be heard to say in defense of the charge of fraud that the innocent party ought not to have trusted him."

Having this view of the law applicable to the question under consideration, it follows that the court, in our opinion, erred in using the conjunction "and" in the instruction. If the appellant at the time he signed the paper was imposed upon and deceived, and in fact a fraud was practiced on him, he had the right to assail its validity, although his mind was not enfeebled, and of course if his mental condition was such that he could not know or understand the contents of the paper, this likewise furnished him a good reason for attacking its validity.

But as the instruction modified as indicated would not conform to the law as we understand it, the court on another trial should in place of this instruction tell the jury in substance that as the appellant admitted signing the receipt offered in evidence, it was binding on him, and they should so find, unless they believe from the evidence that before signing it he did not read or hear it read, or know that it was a release of his claim for damages, and in signing relied entirely on the representations of Dr. McLean, who deceived him as to its contents, or unless they believe that at the time he signed it his mental condition was such that if he had read the receipt he would have been unable to understand and appreciate its meaning or effect.

Counsel for appellant further insist that as this receipt or contract was signed on Sunday it was void. We do not think so. The mere fact that a contract is signed on Sunday does not affect its validity if some essential thing in connection with it, or that is necessary to make it effective between the parties, is done,

or remains to be done, on some other day. Hofer v. McClung & Co., 24 Ky. L. R., 355. In this case the consideration for the execution of the contract, as set out in it, was not paid for some time after its execution.

In reference to the suggestion of counsel for appellees that it was necessary appellant should return the money paid under the receipt before attacking its validity, we think the court fully protected the rights of appellee in directing the jury to give them credit by this amount on any sum they might find for appellant. If this money was paid, as the evidence for the appellees shows, in settlement of medical expenses incurred by appellant, appellees are entitled to be credited by the amount of it on any judgment against them, and this is all.

As appellant testified that it was not his duty to inspect the chains or fixtures, and he did not know of the defect in the bolt or the fact that it was out of repair, and the evidence for appellees showed that the accident was due to a bolt coming out because the tap came off of it, we think the jury in addition to the other instructions should have been instructed that if it was not the duty of appellant to inspect or keep in order the chains and fixtures, or if he did not, after discovering that the chain was caught, direct the engineer to jerk or pull it, they should find for him, if they believed the appellees knew, or by the exercise of ordinary care could have known, that the bolt was defective or loose and appellant did not know its condition and could not have known of it by the exercise of ordinary care.

When the duty of inspection does not devolve on the servant, and when he is not required to look out for defects and make repairs, it is the duty of the master to exercise ordinary care to furnish him with reasonably safe fixtures and appliances to work with, and if he is injured by the failure of the master to perform this duty, he has a cause of action that may be put upon this ground if the servant does not know and in the exercise of ordinary care could not know the defective conditions.

We are further of the opinion that the words "and if they further believe from the evidence that a person of ordinary prudence engaged in like service would not, under similar conditions, have given such directions or made such request" should be omitted from instruction No. 3. If appellant, while engaged in oiling the chain,

discovered a defect in the bolt, and after discovering such defect, he directed Couch to jerk or move the chain, and except for this direction would not have been injured, he should not recover. He was an experienced servant, entirely familiar with the machinery he was working with, and all parts of it, and the engineer had the right to be governed by his instructions in moving the chain. Of course the engineer was not authorized to give the chain an unnecessary or violent jerk or pull, but this feature is presented in instruction No. 2.

The fellow servant question raised in the pleadings and evidence was properly submitted in an instruction which advised the jury that they could not find for appellant unless Couch was his superior and had the right to direct him

For the reasons indicated the judgment is reversed, with directions for a new trial in conformity with this opinion.