## New Bell Jellico Coal Company v. Oxendine.

(Decided November 19, 1913).

### Appeal from Bell Circuit Court.

1. Master and Servant—Fellow-servant — Negligence — Proximate Cause.—In an action brought by a servant against his master to recover damages for personal injuries, caused by the negligence of the latter, in using for operating coal cars at its mine, a defective and unsafe wire rope, which broke and permitted a car to run against a tipple where the plaintiff was weighing coal and injure him, the fact that a fellow servant of plaintiff in charge of the movements of the cars from the mine to the tipple, was negligent in the performance of his duties, could not bar a recovery, as the negligence complained of in the petition was that of the master in permitting the use of the defective and unsafe rope; and, according to the evidence, such negligence of the master was the proximate cause of the plaintiff's injuries.

2. Compromise and Settlement—Fraud—Weight of Evidence.—Although the defendant pleaded, and introduced in evidence, a writing purporting to contain a compromise and settlement of plaintiff's claim for damages resulting from his injuries, as plaintiff alleged fraud in the procurement of the writing, that his signature thereto was obtained when, by reason of his injuries and sufferings, he was incapable of understanding its contents; and that he was induced to sign it by the false representations of defendant's agent that it evidenced a different settlement orally offered by defendant which he had expressed his willingness to accept; and these facts, pleaded in avoidance of the writing, were sustained by the weight of the evidence, the finding of the jury that such writing did not constitute a defense to the action, should not be disturbed.

3.  Compromise and Settlement—Fraud.—While, as a general rule, one who is in full possession of his faculties and able to read, will not be heard to say that he did not know the contents of a paper which he signed and which he had opportunity to read, it is likewise the rule, that if, at the time he signs the contract, he is imposed upon and deceived, and, in fact defrauded, he has a right to assail its validity, although his mind is not enfeebled; and, if his mental condition be such that he cannot reasonably know or understand the contents of the paper, this affords him a stronger and independent ground for attacking its validity.

4.  Trial—Instructions.—An instruction which advised the jury that in order to find for the plaintiff, it was necessary for them to believe from the evidence, not only that the written contract relied on by the defendant, or the oral one testified to by the plaintiff, if there was such an oral contract, was procured by the fraud of the defendant's agents, but also that the plaintiff was at the time incapable of understanding same, erroneously stated the law; as either contract, whether in writing or in parol, was invalid, if procured by the fraud of defendant's agents, or at a time when plaintiff, by reason of his injuries and sufferings, was incapable of understanding same. But as the error indicated, was against the plaintiff, the defendant cannot complain that the instruction was unduly favorable to it, or that the jury found for plaintiff, notwithstanding the double burden it put upon him.

5.  Damages—Personal Injuries—Excessive Verdict.—The verdict of $6,500.00 was not excessive, as it is apparent from the evidence that plaintiff's leg is useless and will make of him a cripple for life; also that the injuries to same and his chest have permanently impaired his health and strength; and that his physical and mental sufferings, continued through a period of many weeks and were very great.

WM. LOW and O'REAR & WILLIAMS for appellant.

B. B. GOLDEN and BROWN & NUCKOLS for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The appellee, Sherman Oxendine, being in the employ of the appellant, New Bell Jellico Coal Company, at its coal mine in Bell county, was put at the work of weighing coal at its tipple, a small frame building, situated several hundred feet from the mine at the end of a straight, steep, double railway track leading down a hill from the mouth of the mine. Coal is removed from the mine in cars containing from 2,000 to 4,000 pounds each. The loaded cars are placed at the head end of one of the double tracks against a contrivance known as a "barney" attached to an endless wire rope which runs from the mouth of the mine to the tipple at the foot of the hill.

With the loaded car placed against the barney, its weight on the rope carries it down to the tipple, where it is dumped and the coal weighed. As a loaded car goes down to the tipple on one of the tracks, an empty car moved with the same rope is carried on the other track back to the mine.

On December 11, 1910, the wire rope operating the cars on the tracks, which admittedly, had become worn and defective, broke, thereby causing a loaded car on one of the tracks to run with great and unrestrained speed down the incline and against the tipple building in which appellee was, at the time, engaged in the performance of his duties as a weigher of coal. Such was the force of the collision that it demolished the tipple and injured appellee; the injuries sustained consisting of a compound fracture of one leg and wounds on the head and chest, the latter producing depression of part of the chest and enlargement of the heart. After the broken bone of the leg had been set by a surgeon, appellee remained in his bed six weeks, during which time he was compelled to lie upon his back with his leg in a wooden box and a twenty-one pound weight attached to his foot. For some unexplained reason, the broken bones of the leg did not properly grow together, but became connected by what is known in surgery as a false joint, in consequence of which appellee is unable to rest his weight upon the injured leg or control its movements. This condition of the leg requires the constant use of a brace. When the brace is on the leg appellee can walk with the aid of a crutch and cane, but, without the brace, he can only walk with the aid of two crutches.

On December 2, 1912, appellee instituted against appellant an action in the Bell Circuit Court to recover damages for his injuries, the right of recovery being based upon the alleged negligence of appellant and its servants in permitting the wire rope, by which the cars on the inclined tracks were operated, to wear out and become so defective as to cause it to break and thereby precipitate the car, by which appellee was injured, upon the tipple where he was at work; it being alleged in the petition that the defective and dangerous condition of the rope was known to appellant when and before appellee received his injuries, but was not known to him. The appellant's answer denied the negligence, by which the petition alleged appellee's injuries were caused, pleaded contributory negligence and, in addition, alleged that, after the injuries complained of were sus-

tained by appellee and before the institution of his action, he and appellant effected a compromise and settlement whereby, in consideration of $200.00 cash in hand, his release from the payment of an $18.00 store account, and a small amount of rent he was owing appellant and its undertaking to give him employment at light work until he became strong enough to obtain other employment, appellee released and discharged appellant from all liability for the damages resulting to him from the injuries complained of; and that appellant had complied with this agreement in full. By an amended answer it was alleged that the agreement in question was reduced to writing and signed by appellee, which writing was filed with the pleading.

In avoidance of the alleged compromise and settlement, appellee's reply, after controverting the affirmative matter of the answer, alleged, in substance, the following state of facts: That a few days after he sustained the injuries complained of and while he was confined to his bed, greatly suffering from such injuries, and by reason thereof incapable of transacting business, he was visited by one Johnson, an officer and agent of the appellant, who proposed, if appellee would accept such a compromise of his claim for damages, that appellant would pay him $200.00 in cash and relieve him of the payment of the store and rent accounts, by way of compensating him for time lost on account of his injuries; and, in addition, give him employment at light work at $2.00 per day, from the time he might become able to do such work until his strength was restored, and then give him permanent employment, as long as it continued to operate its mine; that appellee expressed his willingness to accept the proposed settlement, but that the writing exhibited with appellant's answer, to which his signature was several days later procured, did not correctly express the terms of the proposed settlement, in that it omitted to state that the $200.00, and release from the store account and rent, were to compensate appellee for loss of time resulting from his injuries; and also omitted the undertaking of appellant to give him permanent employment from the time of the recovery of his strength so long as it continued to operate its mines. It was, in substance, further alleged in the reply that W. F. Coram, another of appellant's agents, paid appellee the $200.00, and fraudulently procured his signature to the writing in question by then and there falsely representing that it was a mere receipt for the $200.00, he was to receive by way of com-

pensation in part for loss of time; that he relied upon, and was induced, by the false representations of Johnson as to the proposed basis of settlement, and those of Coram as to the character of the paper, to sign it, which he did while lying on his back in bed, the paper being held by his wife on a book for that purpose; that he signed the paper without previously reading or hearing it read or knowing its contents, and that by reason of his then condition of health and the suffering resulting from his injuries he was incapable of reading it or understanding its terms. The reply contained the admission that, for a few months after appellee got able to leave his home and go about, appellant gave him light work in its store, but alleged that when he became stronger and able to do better work, he requested appellant to give him better and permanent work, whereupon the latter informed him he would not be permitted to continue to perform the light work he had been doing in the store, but that he might undertake the work of picking slate from the "shakers," and when told by appellee that this work was too severe and dangerous for one in his crippled condition to perform, appellant wrongfully refused him any other work and discharged him from its service; that when thus discharged appellee learned, for the first time, of the existence of the writing relied on by appellant as a settlement, and of its contents; also of the fraudulent means by which appellant had secured his signature to same; and being convinced that appellant did not intend to comply with the terms of the oral contract it had actually made with him and had not intended to do so when its agent pretended to enter into same, appellee brought this action to recover damages for his injuries, after first offering to return, and making a tender to appellant of, the $200.00 he had received from it, with interest from the date of its receipt by him, but that appellant refused to receive same.

The affirmative matter of the reply was controverted of record, and, upon the issues thus made, the case proceeded to trial, which resulted in a verdict in favor of the appellee for $6,500.00 damages. From the judgment entered upon that verdict, this appeal is prosecuted.

It will be well, before considering the evidence presented by the record, to briefly state the law applicable to the issues of fact made by the pleadings. If, as claimed by appellee, he was induced by the fraud and misrepresentation of the appellant's agent or agents to enter in and attach his signature to the written agree-

ment constituting the basis of the latter's defense, and he was, at the time of agreeing to it, ignorant of its contents, or incapable of understanding its meaning, he is not estopped to attack its validity.   While, as a general rule, a party, who is in full possession of his faculties and who is able to read, will not be heard to say that he did not know the contents of a paper which he signed and which he had opportunity to read and understand, it is likewise the rule that, if, at the time he signs the contract, he is imposed upon and deceived and, in fact, defrauded, he has a right to assail its validity, although his mind is not enfeebled; and if his mental condition be such that he connot reasonably know or understand the contents of the paper, this affords him a stronger and independent ground for attacking its validity.   Ross v. Oliver Bros. & Honeycut, 152 Ky., 437; L. & N. R. Co. v. Crutcher, 135 Ky., 381; L. & N. R. Co. v. Helm, 121 Ky., 645; I. C. R. R. Co. v. Keeber, 27 Rep., 305.

It is likewise true, that if appellant, through its agent, Johnson, made with appellee the oral contract, the latter believed and alleged was agreed to by them, and appellant did not intend at the time, to comply with it; or such oral contract was made through its agent with the intent to employ it as a means of thereafter obtaining appellee's signature to the writing relied on by appellant as evidencing a compromise of his claim for damages, by falsely representing to him that it contained the oral contract as appellee understood it, and it did thereby obtain his signature to the writing when appellee, by reason of his injuries and sufferings, did not understand, and was incapable of understanding its contents, in either of these events the latter was not estopped to sue for the damages resulting from his injuries caused by appellant's negligence.

The evidence introduced in appellee's behalf conduced to prove that the writing relied on by appellant as showing a compromise and settlement of his claim for damages was executed under the circumstances alleged in his reply.   According to appellee's own testimony, appellant's agent, Johnson, called to see him while he was confined to his bed, with his broken leg in a box and a weight attached to his foot, and when he was greatly suffering with pain, at which time the following conversation took place, which we give in appellee's own language: "Mr. Johnson said he wanted to adjust the matter between me and him and said he had investigated it

and found out there was nothing in the accident that happened, and he thought we ought to come to some agreement about it and he thought from his investigation and from what his lawyers said they would beat the cases for $100.00 apiece.''

"Q. What cases? A. This suit of mine, if I sued his lawyers would beat it for $100.00, and he said, of course, you might sue us and get a judgment in this court, but we would carry it further and you might be an old man by the time you received anything out of it, and he told me he would give me $200.00, and he thought that he ought to pay me for the time that I lost or that I would be sick.

"Q. What did he say that he would give you the $200.00 for? A. That would partly pay me for my time lost.

"Q. For your injury there? (Objected to by attorneys for defendant.)

"By the court: Don't lead the witness.

"Q. Go ahead? A. Then he told me, he says, Oxendine we will do you right and I will as one of the company, and I claim to be a lawyer myself, I will give you my honor as a man that I will take care of you and see that you are taken care of so long as we run business in this hollow; and he went further and said now when you get able to go out at all you come up to my store and I will start you on the pay-roll the minute you get out at $2.00 per day, and I will continue to pay this $2.00 per day until you get strong and able to go back to your work again, and he further promised that he would continue to pay me the $2.00 per day right on so long as they run business.''

Appellee further testified that, after he expressed his willingness to accept this proposition believing that Johnson would do what he promised, Johnson, as he was leaving, said, he supposed there was no use to put the agreement in writing.

It further appears from appellee's testimony that, before having the above conversation with him, Johnson excluded from the room appellee's son and two daughters, all of whom were adults, but permitted to remain in the room appellee's wife and an infant child. His son, Chester Oxendine, who testified in his father's behalf, stated that the conduct of Johnson in excluding him and his sisters from the room before entering into conversation with his father, excited his suspicion and

that, in leaving the room and entering an adjoining one, he left the door slightly ajar in order that he might hear what passed between Johnson and his father. He further testified that he heard the most of what was said by both of them, and that, among other things, he (Johnson) said: "I came down to adjust this matter with you, Oxie, old boy, we will give you $200.00 and square your store account and your rent if you will let this drop and also we will furnish you with a job at $2.00 per day until you get able to go to work and when you get able to go to work you can have anything you like; and more than that anything that we can do for you, old boy, we will do it and we will take care of you as long as you are in this shape."

It will thus be seen that appellee is corroborated by his son, as to what occurred while Johnson was with him, and his testimony and that of the son is contradicted by the testimony of Johnson alone. Appellee is also corroborated by his son as to what occurred at the time his signature was procured to the writing relied on by appellant as evidencing the compromise and settlement of appellee's claim. According to their testimony, appellee's signature to the writing was obtained by appellant's agent, Coram, at a time when appellee was still confined to his bed and suffering from his injuries, as when Johnson visited him; that the writing was neither read by him nor to him; and that he signed it upon the representation of Coram that it was merely a receipt for the $200.00 Johnson had promised to pay him. According to the testimony of appellee and his son, it is questionable whether the former, in view of the character of his injuries and his physical weakness and suffering, was capable of clearly understanding the transaction in which he was thus required to take part, and in the absence of any reasonable explanation from either Johnson or Coram, it is difficult to understand why the services of both were necessary in the procurement of the alleged compromise and of the signature of appellee to the writing claimed to have been drafted to evidence its terms. It may also be asked why Johnson, when he called to see appellee for the purpose of effecting a compromise of his claim, excluded from the room all the members of his family save his wife and an infant child before taking up the matter of the compromise, unless it was to prevent the excluded persons from taking part in, or hearing, the conversation between himself and appellee. The ex-

cluded persons, being persons of intelligence and of lawful age, would have been competent witnesses as to what occurred between Johnson and appellee. It is not unfair to Johnson to indulge the inference that it was his purpose to be rid of the members of the family who, if permitted to remain, would have been competent to discredit his version of the agreement; and that he did not exclude the wife and infant child of appellee from the room, because the former could neither testify for nor against the husband, and the latter was too young and immature to understand or testify to what occurred.

Coram was not introduced as a witness by appellant, So the testimony of appellee and his son as to what occurred and as to the physical and mental condition of the former, when his signature was obtained to the writing, is uncontradicted; and only Johnson contradicted them as to what took place when he visited appellee and claimed to have agreed with him upon the compromise set forth in the writing.

It was admitted by appellee that, when he got about, appellant gave him light temporary work in its store at $2.00 per day for several months, but when, according to his evidence, he became able to do other and better work in appellant's service and asked it to give him permanent employment, it not only refused the request but refused him further work and dismissed him from its service. Down to that time, appellee believed he had' been continued in appellee's service according to the terms of what he supposed to be the oral agreement made with him by its agent Johnson, with which, it appears, he would have been content. But when, upon being discharged by appellant, he learned of the existence of the writing relied on by the latter, and of the fraud practiced upon him by the latter's agents, Johnson and Coram, in procuring his signature to the writing at a time when he was ignorant of its contents and his condition of body and mind was such as to render him incapable of understanding its terms, he, at once repudiated the instrument and, after tendering to appellant the return of the $200.00 it had paid him, with interest, brought suit to recover damages for his injuries.

In its essential features, the case is closely akin to those of L. & N. R. R. Co. v. Helm, 121 Ky., 645, and L. & N. R. R. Co. v. Crutcher, 135 Ky., 381, in each of which the party injured was allowed to recover for his injuries, notwithstanding the plea by the defendant of a written release; it being held that, as the instrument was

obtained by the defendant's fraud, it could be repudiated by the plaintiff.

Appellant not only relied on its alleged right under the writing in question to discharge appellee from its service, but claimed that such discharge was justified by his misconduct while in the store. The charge of misconduct arose out of a discrepancy of about $6.00 in the account of money orders in the post office kept at the store. It is by no means clear from the evidence that the discrepancy resulted from any act of appellee, and it was not made to appear that it involved any moral turpitude on his part.

It is manifest from the evidence, that appellee's injuries were caused by appellant's negligence in permitting the use of the defective wire rope in operating its coal cars, and, we think, also fairly apparent from the evidence, that the writing upon which appellant rests its resistance of the appellee's right to recover the damages claimed, was procured by its fraud. The case is one in which appellant, as master, failed to provide appellee, its servant, with a reasonably safe place to work, as it was its duty to use ordinary care to do. Appellee, who was charged with no duty of inspection in connection with his work, had the right to take it for granted that this duty appellant would properly perform, and there is nothing in the evidence which tends to show that the defectiveness of the wire rope was known to him, or was so obvious that it must have been known to one situated as he was.

There is no force in the appellants' contention that appellee's injuries were caused by the negligence of Stewart, a fellow servant, for which reason he was not entitled to recover. There was some evidence of negligence on the part of Stewart in operating the car by which appellee was injured, but as the negligence of appellant in permitting the use of the defective and dangerous wire rope is the ground of recovery relied on and such negligence was established by the evidence, it is unnecessary to determine whether Stewart was a fellow servant of appellant. If it be conceded that he was a fellow servant, it is apparent that whatever negligence he was guilty of, concurred with appellant's negligent use of the defective wire rope in causing appellee's injuries, and manifest from the evidence that the defectiveness of the rope was the proximate cause of the appellee's injuries.

At the conclusion of the evidence appellee asked, and the trial court gave, instructions one, two, three and four. Instruction one is predicated upon the averments of negligence contained in the petition, and is, on the whole, free from substantial error. Instruction two, is on the subject of contributory negligence, which it correctly defined, and advised the jury what would constitute such negligence on the part of appellee and in what state of case it would defeat a recovery. Instruction three correctly gave the measure of damages by which the jury were to determine the amount recoverable in the event of their returning a verdict for appellee. Instruction four merely gave the definition of ordinary care as used in the instructions and as often approved by this court.

It does not appear from the bill of exceptions that instructions one and three were objected to by appellant, though two and four were, in view of which, if instructions one and three were open to the objections now urged to them, we would have no right to consider them.

Appellant, through its counsel, offered instructions "O" and "Q"; the first being a peremptory instruction directing a verdict for appellant, was properly refused. Instruction "Q" was also properly refused, as what it contains was, in effect, expressed in instruction number five, which the court gave on its own motion. Appellant objected to the court's refusal of instructions "O" and "Q" and to the giving of instruction five; and to the latter, appellee also objected.

Instruction five, which, in our opinion, was prejudicial to appellee rather than appellant, told the jury, in substance, that although they might believe from the evidence that appellee's injuries were caused by appellant's negligence as predicated in instruction one; if they also believed from the evidence appellee and appellant in good faith entered into the written contract filed with the latter's answer, or into the alleged oral contract testified to by appellee, intending that either should be a full and complete compromise and settlement on account of the damages appellee sustained from his injuries, they should find for appellant. But if they believed from the evidence that the contracts, or either of them, if either was made, were procured by false and fraudulent representations on the part of appellant or its agents, and that the latter did not at the time intend to perform such contracts. or either of them; and should further believe

from the evidence that appellee was induced by such false and fraudulent representations, if any, to enter into them, or either of them, when he would not otherwise have done so, *and* that he was at the time incapable, by reason of his injuries and sufferings, if any, of understanding the contents of same, they should in that event find for appellee.

This instruction is inaptly worded, but we are unable to see that it was in any particular prejudicial to appellant. It does, however, contain an error which, had there been a verdict returned for appellant, must have made it prejudicial to appellee. The error consists in its advising the jury that in order to find for appellee, it was necessary for them to believe from the evidence, not only that the written contract relied on by appellant, or the oral one testified to by appellee, if there was such an oral contract, was procured by the fraud of the appellant's agents, but also that he (appellee) was at the time incapable of understanding same. Whereas, either contract, whether in writing or in parol, was invalid, if procured by the fraud of appellant's agents, *or* at a time when appellee, by reason of his injuries and sufferings, was incapable of understanding same.

In Ross v. Oliver Bros & Honeycut, supra, the plaintiff sought to recover damages for injuries sustained through the negligence of the defendant. The latter, in addition to denying the negligence complained of, relied upon a written release, procured from the plaintiff, as a bar to the action. By the reply, the plaintiff alleged his ignorance of the release when signed by him, his incapacity to understand its contents and that he was induced to sign same by the fraud of defendant's agent. With respect to the legal effect of the release, the jury were instructed that they should find for the plaintiff, "unless the jury believe from the evidence that the written release dated April 25, 1910, exhibited and read in evidence to the jury, was procured from the plaintiff by the defendants or some one representing them, without the plaintiff knowing or being aware of the fact that said writing contained a release, at a time when his mind was so enfeebled that the plaintiff was unable to know or comprehend the contents of the paper, *and* when he did not know or understand what he was doing, the jury should find for the defendants without regard to the other instructions."

We condemned this instruction and, because of its being prejudicial to the plaintiff, reversed the judgment.

In reaching this conclusion, we said, ''Having this view of the law applicable to the question under consideration, it follows that the court, in our opinion, erred in using the conjunction and in the instruction.  If the appellant at the time he signed the paper was imposed upon and deceived, and in fact a fraud was practiced on him, he had the right to assail its validity, although his mind was not enfeebled, and of course if his mental condition was such that he could not know or understand the contents of the paper, this likewise furnished him a good reason for attacking its validity.  But as the instruction, modified as indicated, would not conform to the law as we understand it, the court on another trial should in place of this instruction tell the jury, in substance, that as the appellant admitted signing the receipt offered in evidence it was binding on him and they should so find, unless they believe from the evidence that before ''signing it he did not read or hear it read, or know that it was a release of his claim for damages, and in signing relied entirely on the representations of Dr. McLain, who deceived him as to its contents, or unless they believe that at the time he signed it his mental condition was such that if he had read the receipt he would have been unable to understand and appreciate its meaning or effect.''

Manifestly, appellant cannot complain of an instruction that was unduly favorable to it, or that the jury found in appellee's favor, notwithstanding the double burden put upon him by the instruction.

No reason is apparent for appellant's complaint that the verdict is excessive.  It is, however, apparent from the evidence that appellee's injured leg is useless and will make of him a cripple for life; also that the injuries sustained to his head and chest have seriously and permanently impaired his health.  In view of all these injuries, the physical and mental suffering and consequent impairment of his power to earn money, resulting to appellee therefrom, we are unable to say that the verdict is excessive.

Judgment affirmed.