## Louisville & Nashville Railroad Company v. Winkler.

(Decided February 18, 1915.)

### Appeal from Bullitt Circuit Court.

1. **Railroads—Action for Personal Injuries—Negligence.**—Where a conductor on a freight train was injured while in the performance of his duties through the negligence of a brakeman, who, in the absence of the conductor, coupled onto the train a car with a defective draw-head, the negligence of the brakeman was not attributable to the conductor, although the conductor was superior in authority to the brakeman.

2. **Railroads—Employers' Liability Act.**—Where there is evidence conducing to support the averments of the petition constituting ground of action relied on for recovery, although the weight of the evidence, both numerically and in probative value, may be with the defendant, the evidence is sufficient to sustain the verdict of the jury, although the case is laid and practiced under the Federal Employers' Liability Act.

3. **Railroads—Contributory Negligence—Inspection.**—Where the conductor in the line of his duty was elsewhere engaged, it can not be said that he was guilty of contributory negligence in not being

present at the time a defective car was coupled onto the train, or in not personally inspecting the car before it was coupled.

4.  Trial—Employers'. Liability Act.—In cases tried in the State courts under the Federal Employers' Liability Act, three-fourths or more of the jury may return a verdict.

5.  Personal Injuries—Action for—Verdict.—Where one was suffering the consequences of an injury received five years before, but not to the extent of incapacitating him from service or lessening his power to earn money, and he received another injury from his master's negligence, which permanently and greatly aggravated the consequences of the first injury, and wholly incapacitated him from service, rendering him dull and stupid, impairing his powers of speech and faculties of sight, hearing, and feeling, incurred medical expense of $100, and lost $400 in time, a verdict of $2,500 is not excessive.

6.  Contracts—Evidence—Submission to Jury.—Evidence examined and held to warrant submission to the jury whether at the time the injured party signed a contract in settlement of damages he was mentally capable of understanding his rights and making a contract concerning them, or whether the contract was procured by fraud or misrepresentation.

CHAS. H. MOORMAN, CHAS. CARROLL and BENJAMIN D. WARFIELD for appellant.

C. P. BRADBURY and S. L. TRUSTY for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

In this action the appellee recovered $2,500 damages for personal injuries he received in an accident on a freight train upon which he was serving appellant in the capacity of conductor. The accident happened on the night of January 3rd, 1913, at what is called Crooked Hill, on the Knoxville branch of appellant's road, near East Burnstadt, in Laurel County. The action was brought under the Federal Employers' Liability Act.

Appellant defended on the ground that Winkler's injury was due solely to his own negligence. In another paragraph it plead that he was contributorily negligent, and by an amended answer it plead accord and satisfaction.

Appellant asks for a reversal because, (1) Winkler failed to prove that the accident in which he claims to have been injured was due to defendant's negligence; (2) under the Federal Employers'. Liability Act, it was plaintiff's duty to sustain his case by a preponderance of the evidence, and a mere scintilla of evidence is not sufficient; (3) on the same authority a unanimous ver-

dict of the jury is required, instead of a majority verdict as was rendered in this case; (4) the damages were excessive; (5) the evidence overwhelmingly showed that Winkler possessed contractual capacity, and that it was the duty of the court to instruct the jury as a matter of law that Winkler could not recover in the face of his contract executed in settlement of the liability; and (6) error in instructions.

A statement of the facts will be necessary for a consideration of the questions raised. The accident happened about midnight; the train was a double-header composed of 68 freight cars. Fifteen or twenty minutes before the accident the train had stopped at Copley, near the foot of Crooked Hill, and took up one or more cars. One of these, an L. & N. ballast car, was put in immediately behind the engine, so that it had the load of the whole train to carry. While they were switching at Copley, and these cars were being added to it, Winkler was at the rear end of the train in the caboose seated at a desk working on his books or reports. This ballast car was coupled onto the engine by a brakeman. It is admitted that Winkler was superior in authority to the brakeman, and that his general duties included inspection of his train and cars. It is also conceded that it was the duty of the brakeman to make the same inspections, and particularly of cars coming directly under his observation as in this case. The brakeman says that at the time he made the coupling the draw-head on the ballast car was dropped down about an inch, that is, out of plumb. He admits, and no one disputes, that this was some indication of a defect in the fastening of the coupler, or draw-bar to the car. He did not look under the car or make any examination of the fastenings as he should have done in view of the steep hill the train was about to climb, and the heavy train this car had to carry. In about fifteen minutes after the car was coupled on, and while the train was climbing Crooked Hill, and while Winkler was still seated and at work in the caboose, this draw-head pulled out, with the result that the brakes were instantly set on the train, and the sudden stop pitched Winkler forward about ten feet and his head struck the water cooler in the forward end of the car. A gash was cut to the bone on the right side of his head, and he suffered other injuries which at the time he thought were of a minor

nature. Recovering himself, he went to the front of the train and found that the draw-head had pulled out of this ballast car, and saw it laying there on the track. In describing the condition as he saw it, he says: "It was the draw-bar and the old draft timbers pulled out with the draw-bar. * * * It looked like the draft-bolts had split out through the car. * * * It was a kind of an old split where it pulled out." This evidence as to the condition of the timber and the old split and bolts pulling out is not denied. Neither is there any denial of the fact that at the time the car was coupled the draw-bar was hanging down at least an inch out of alignment. There is difference of opinion among the witnesses as to whether the hanging down of the draw-bar indicated that its fastenings to the car were dangerous. But the proof amounts to more than a scintilla, and is sufficient, in our opinion, to warrant a submission of the case to the jury on the proposition as to whether the railroad company negligently failed to perform the duty of exercising ordinary care to have and keep the draw-bar and those attachments and fastenings under the car in a condition reasonably safe and sufficient for use in the train in question.

Appellant says that a mere scintilla of evidence is not sufficient to sustain a case under the Federal Employers' Liability Act. It contends that the court should have instructed the jury that they could not find for the plaintiff unless they believed from a preponderance of the evidence that his theory of the case, as averred in the petition, is true.

In the recent case of L. & N. v. Johnson's Admr., 161 Ky., 836, this question was disposed of adversely to appellant's contention in the following language:

"If the evidence in a case heard and determined under this act would be sufficient to take the case to the jury and support the verdict if the suit had been brought under the State law, it would be sufficient to take the case to the jury and support the verdict if it was brought under the Federal Act. And it is the well settled practice in common law actions in this State that the case should go to the jury if there is evidence conducing to support the averments of the petition constituting the grounds of action relied on for recovery, although the weight of the evidence, both numerically and in probative value, may be with the defendant."

On the question of contributory negligence the court properly instructed the jury under the Federal Employers' Liability Act, that "It goes by way of diminution of damages, if any, in proportion to his negligence as compared with the combined negligence, if any, of the plaintiff and the defendant, if any."

It is not contended that appellant was guilty of any negligence in the way of unusual or unnecessary jerks or any improper operation of the engine. The only negligence attempted to be shown on the part of the appellant was as to the alleged defective condition of the draw-bar and its fastenings. As we have already indicated, the proof in this regard was undisputed and it was sufficient to take the case to the jury.

The only pretense that the appellee Winkler was guilty of contributory negligence arises from the fact that he was conductor of the train and was superior to the brakeman who coupled this defective car onto the train, and having general charge of the train and employes, it was primarily his duty to inspect the car, and having failed in this, appellant contends it was contributory negligence, or rather that his was the only negligence shown.

To prevent a recovery under the Federal law, the injury must have been due solely to appellee's negligence. Contributory negligence does not defeat, it only diminishes the amount of recovery. But we are unable to see that appellee was guilty of any negligence. At the time of the accident he was personally engaged in the performance of his duties. It was the special duty of the brakeman under the circumstances to examine the defective draw-bar. The conductor at the time was no more chargeable with dereliction on the part of the brakeman than he would have been for the engineer or any other employe. While they were in a measure subject to his control, yet it was not his duty—it was impossible for him to personally supervise each of them as they performed their multitude of duties.

The case of L. & N. v. Heinig's Admr., 162 Ky., 14, was to recover damages under the Federal law for the death of a railroad engineer resulting from collision. It was primarily the duty of the engineer to observe train orders placed in his hands and keep a lookout to avoid collisions. It was also the duty of the conductor under certain conditions to apply the angle-cock and stop the

train. It was held that where the conductor failed to perform his duty, there might be a recovery for the engineer's death, although his negligence created the condition which caused his death.

Appellant says that under the Federal law a unanimous verdict is required. This question was disposed of adversely to appellant's position in overruling a petition for rehearing in the case of C. & O. v. Kelly's Admr., 161 Ky., 655, where it was held that in cases brought in the State courts under the Federal Employers' Liability Act, three-fourths or more of the jury may return the verdict as provided in Section 2268 of the Kentucky Statutes.

It is next contended that the damages are excessive. This contention grows out of the fact that before this injury appellant was suffering serious consequences from an accident which happened to him about five years before. The cause of the accident is not explained, but it appears that he received a blow on the left side of his head, and appellee admits that he had had one spell of epilepsy apparently traceable to it. Other witnesses testify to having seen him have as many as a dozen epileptic fits during the five years preceding, but the evidence shows that they were not frequent and of short duration, and, with perhaps one exception, there was no interference with the performance of his duties as conductor. In the injury complained of he received a depressed fracture of the skull on the right side of his head. From January 3rd, the time of the accident, to January 26th, when he returned to work, he was under the care of a physician most of the time, and from then until October he worked most of the time. He then had to give up his work entirely because of the increasing frequency and severity of the epilepsy. Medical testimony shows that after this last injury each spell would affect him for several days. That he became extremely nervous; lost weight; that he had a twitching and jerking of the muscles in his face and jaws, an impediment in his speech; and the neck muscles had a certain amount of paralysis—numbness; that his sight and hearing were impaired, and that his mentality had become very weak. One of the physicians examined him a few months before the accident and again in December following—about the time of the trial. He attributed the origin of his epilepsy to the old injury on the left side of his head.

But he said that the last injury on his right side had greatly accentuated the trouble. He said the first injury did not affect his sight and hearing or nervous system, although it left him with a numbness in the neck muscles of the left side. He attributed his present enfeebled condition mentally and physically, and the defect in sight, hearing and speech, to the last injury. In fact, the physician said that Winkler had become so stupid as to render impractical some of the tests which he desired to subject him to in the examination last made. In addition to this, the proof showed that he lost time of the value of $400 and incurred $100 medical expense. Under this testimony we are unwilling to say that the verdict was excessive.

The appellant pleads satisfaction of the liability by a receipt which Winkler signed on March 10th, acknowledging payment of $75 by the appellant, "in full compromise, settlement and adjustment of all claims and demands on account of injury to the person, including those which may hereafter develop, as well as those now apparent, and damage to and loss of property sustained by him at or near East Burnstadt, Kentucky, on the 3rd day of January, 1913, while a freight conductor on said company's railroad and on every other account whatsoever." The receipt further stipulates that it is understood that this settlement is not based upon any promise of future employment nor is it paid in settlement of any claim for lost time or wages.

Winkler claims that he was mentally incompetent at the time to make a contract or to understand his rights with reference to the injury. He says that while in that condition an agent of appellant represented to him that they would pay him his wages for lost time to the amount of $75 and that he agreed to take it if the company would send it to him. He denies any knowledge of ever signing a contract, but admits he received the $75. He says that if he did sign a contract of settlement it was by mistake and fraud practiced upon him by the defendant.

The court gave to the jury this instruction:

"If the jury believe from the evidence that the paper relied on by defendant as a release was signed and executed by both plaintiff and defendant with the mutual understanding that it was for time lost by plaintiff from his injury to that date and that the plaintiff executed the release by mistake or by fraud of the defendant, and

that when plaintiff executed the release he was mentally incapable of understanding same, you will disregard said paper, but unless the jury so believe, the law is for the defendant.''

It will be noted that by this instruction the jury must find three things concurring, viz., mutual understanding that the payment was for lost time; and that he was induced to execute the release by mistake or fraud; and that he was mentally incapable of understanding the same. This instruction was too favorable to appellant, for the contract was invalid if it was procured by fraud or if the appellee was mentally incapable of understanding it. New Bell Jellico Coal Company v. Oxendine, 155 Ky., 840.

But appellant argues that notwithstanding the expert opinion evidence, and which it insists should be disregarded, the facts are conclusive that he did understand his rights, and knew what he was doing when he signed the release, and that, in fact, he, by conversation and correspondence, negotiated the settlement. It introduces two letters written by appellee which on their face indicate that they were composed by a man of at least average intelligence, and appellee admits that he wrote them. He says, however, that they were written at the instance and practical dictation of appellant's agent, who effected the settlement and in order that the agent might have something to present to his superiors in his effort to get payment for the time lost.

Appellee shows that $75 is about the amount he would have earned between January 3rd and January 26th, when he returned to work. He does not deny signing the release—he says he has no knowledge of it. It is signed ''J. A. Winkler,'' and he says he never signs his name that way. He introduces witnesses to prove that on the 10th of March, the date of the release, he was at his home town, and that he was found wandering about in the upstairs room of a relative's house. His wife's grandmother lived there and it was not unusual for him to go to see her. On inquiry by the people of the house he said that he was there to see her, but the witnesses say that she was never known to be upstairs and she was not that day. They say that he had no mind at all, and was not competent to transact any business. The doctor who examined him at the trial gives it as his opinion that he was not mentally competent to

transact business and had not been since the second injury. There is room for difference of opinion as to Winkler's mental capacity from the facts given in evidence, but it was the peculiar province of the jury to pass upon these facts.

On the whole case, we think the judgment should be affirmed, and it is so ordered.