## Webber's Administratrix v. Louisville & N. R. Co.

(Decided June 21, 1935.)

(As Modified on Denial of Rehearing Nov. 26, 1935.)

H. B. KINSOLVING, Jr., and LESLIE W. MORRIS for appellant.

ASHBY M. WARREN, J. P. HAMILTON, C. S. LANDRUM, J. K. TODD and H. T. LIVELY for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellant, administratrix of the estate of Louis R. Webber, deceased, brought this suit against the Louisville & Nashville Railroad Company to recover of

it for the death of her decedent, Louis R. Webber, who was killed near Shelbyville, Ky., on the 16th day of May, 1932, while at work as a brakeman on the railroad company's train. We will refer to the parties as plaintiff and defendant according to their respective positions in the lower court.

It is stipulated that at the time of the accident defendant was engaged in operating a freight train in interstate commerce, and that Webber, the deceased, at the time of his death, was assisting in the operation of said interstate train.

At the conclusion of the evidence for plaintiff, the court peremptorily instructed the jury to find a verdict for the defendant, and from a judgment entered pursuant to the directed verdict, plaintiff brings this appeal.

It is the contention of plaintiff that her decedent's death was caused by the negligence of his fellow servants and employees and the conductor in charge of the train. On the other hand, defendant contends that decedent's death was caused by his own negligence.

The facts are in substance these: At about 6:50 o'clock p. m. on the evening of the accident, the train arrived at the tower near Christiansburg station, which is a short distance north or northeast of the Shelby siding. The train was composed of about 38 cars, five of which were to be placed on the Shelby siding. Four of these cars were immediately behind the engine and were cut from the train and Webber and certain other brakemen with the fireman and engineer took the four cars to the Shelby siding and left them, and returned with the engineer back to Christiansburg station to get the eighteenth car which was also to be taken to the Shelby siding and placed thereon with the other four cars just previously left there. Up to this point the facts are not in dispute. But the parties differ as to what happened after the return to Christiansburg station to get the eighteenth car, and particularly as to whether the eighteenth car was cut from the remaining rear cars at Christiansburg, leaving the rear part of the train at that point, or whether the whole train was moved toward the Shelby siding to a point where the cut was to be made to segregate the eighteenth car.

The plaintiff introduced all the members of the train crew except one brakeman, Kindle, to show Web-

ber's position in the train during the various movements and shifts and to show that the train was cut at Christiansburg by brakeman Kindle, instead of being cut by Webber near the Shelby siding as claimed by defendant, where the accident occurred. After counsel for plaintiff had examined the witness on the points they desired to bring out, counsel for defendant then proceeded to cross-examine the witnesses as to the entire operation of the train and all that occurred. They all testified that when the engine returned to Christiansburg from the Shelby siding after placing the first four cars thereon, it was connected with the entire train, and Webber and perhaps all other members of the crew except brakeman Kindle, who was left in the rear on the caboose, remained on the engine until they reached a point or distance of or about the length of six or eight cars north of the Shelby siding switch and Webber got off the train at that point and cut the train so as to segregate the eighteenth car for the purpose of placing it on the siding, leaving the balance of the train standing on the track, but failed to set the brakes or open the angle cock so as to prevent the train from moving, and after the engine proceeded south and the eighteenth car had reached the point where it was to be switched, the rear portion of the train left behind as indicated above rolled down the track and caught Webber between the bumpers of the rear end of the eighteenth car and the front car of the rear portion of the train, which resulted in his death.

James Leary, the conductor, testified that when they returned to the tower or Christiansburg station to get the eighteenth car they connected the engine to the entire train and moved toward Shelby siding for the purpose of setting off the eighteenth car with the other four cars they had left there on the previous trip and Webber and other members of the crew except Kindle, the flagman, who rode in the caboose to protect the rear end of the train, were on the engine. As the train moved south toward Shelby siding, Webber got off the engine about the end of the four cars which he had previously assisted in placing in the Shelby siding, so as to be in a position to make the cut between the eighteenth and the nineteenth cars, whereby the eighteenth car could be placed into the siding. The conductor was asked and answered as follows:

"Q. What was his [Webber's] purpose in getting off? A. To cut that 18th car off from the train.

"Q. Now, about where did he get off? A. I judge it was twelve or thirteen cars from the switch, be about ten cars in the clearance.

"Q. What did you do? A. I got off. Mr. Webber got off first and Mr. Herron got off to switch, I dropped in behind them south of the switch. * * *

"Q. What was the purpose of Mr. Herron getting off? A. Getting off to switch so he could throw the switch when he pulled back to back the car in.

"Q. You were setting the 18th car off? A. Yes sir.

"Q. What were the duties of Mr. Webber and the custom as to such movements that were made —what was the duties of Mr. Webber on that occasion? A. Mr. Webber's duty was to cut that 18th car off and to anchor that train down with hand brakes or open the angle cock.

"Q. Anchor what train? A. The rear portion, the sixteen cars left setting there. * * *

"Q. After the cut was made was any signal received from anyone? A. Yes sir, Mr. Webber stepped out and gave a signal."

Lloyd Head, the engineer, testified that he pulled the engine about six or seven car lengths south of the switch because they had the eighteenth car to set off and he stopped at a point so as to leave the eighteenth car about twelve car lengths north of the switch to make the cut to segregate the eighteenth car.

Escher Herron, a brakeman, was asked and answered as follows:

"Q. One other question I would like to ask Mr. Herron. Mr. Herron when the train stopped at the Shelby siding the last time to make the cut of the eighteenth car, where did the engine stop? A. I couldn't tell you exactly but I judge something like seven or eight cars possibly further south of the switch.

"Q. The eighteenth car was in what position with reference to the switch? A. Well, the eighteenth car was something like—you mean from the switch not the clearance point?

"Q. Yes. A. I judge the eighteenth car was something like nine or ten car lengths from the switch.

"Q. How far was Mr. Webber from the switch when he got off the train down there? A. He got off the best I remember along near the south end of the four cars that we had shoved in there.

"Q. How far was that from the switch? A. That would have made that something like I guess seven or eight cars from the switch.

"Q. In other words, when the train went down the last time Mr. Webber was riding in the engine? A. That is right.

"Q. And when he got off the train he got off about six or seven car lengths north of the switch? A. He got off—that is customary that a man that is going to make a cut will always, almost always, most of them do get off as near as they can where they figure that part of the train will be when it comes to a stop. * * *

"Q. Did you notice Mr. Webber at that time as you got off at the switch, notice—see his lantern? A. Yes, sir, I noticed him.

"Q. What did he do? A. When the train came to a stop I saw his lamp going, moving back by the side of the train.

"Q. Did you see him go between the cars? A. He went between the cars the last I saw I got a 'go ahead' signal and passed it to the Engineer.

"Q. You got that signal from Mr. Webber? A. Yes sir. * * *

"Q. Whose duty was it to anchor the rear portion of that train on that occasion? A. On this particular occasion?

"Q. Yes sir. A. Mr. Webber's. He was the man that made the cut.

"Q. Was that train anchored? A. It was not.

"Q. Was it dark at that time? A. It was.

"Q. Were you passing signals by lantern? A. We was.

"Q. When you first saw Mr. Webber come out, explain to the jury what you did—say how you recognized him on that occasion. A. By his lantern, by the signal he gave I naturally judged it was him, because there was no one back there but him."

It is conceded that it was the duty of the one who cut the train to anchor the rear portion of it by setting the brakes or opening the angle cock. It follows that if Webber made the cut in question it was he who failed to anchor the train and his death was caused by his own negligence.

According to the direct and positive evidence of the members of the train crew as indicated above, Webber made the cut near the Shelby switch. The evidence of plaintiff's witnesses does not directly contradict the evidence of the trainmen. The evidence of the witnesses for plaintiff was in substance as follows:

Lilly Barnes, a colored woman, testified that she was living close to the depot at Christiansburg on the day the accident occurred and she observed the movement of the train just a few minutes before Webber was killed. She said that she saw the engine with a number of cars attached to it leave the vicinity of the depot or station, traveling west, and just a few minutes after the engine and cars passed, another cut of cars with no engine or tender attached to them came moving from the direction of the station and tower west of her home, and soon after the last cars passed she heard the collision, and she and her husband went to the point near the switch at the Shelby siding and found Mr. Webber crushed between the cars. Frank Barnes, husband of Lilly Barnes, also testified to about the same state of facts as his wife had testified to, and further said that "they cut the cars loose up there by the depot." George Nettle testified that he saw a train pass going towards the Shelby siding and soon thereafter he saw another bunch of cars coming down the track with no engine or tender attached, and soon after the last

cars passed he heard the collision. Alma Taylor testified that she lived near the Christiansburg station or depot and saw the train or a part of it with the engine pass down the track toward the Shelby siding, and soon thereafter another portion of the train went rolling down the track with no engine attached and soon after it passed she heard the collision. Mildred Taylor gave a like testimony with respect to the two portions of the train passing and the collision happening soon after the last cars went down the track.

The evidence of. the various witnesses for plaintiff standing alone is sufficient to create the inference that the train was cut near the tower or Christiansburg station, but there is no evidence tending to show who made the cut, if it was made at Christiansburg. It is conceded that when the train left Christiansburg Webber was on the engine, and Kindle was with the rear portion of the train, perhaps in the caboose acting as rear flagman. It is argued for plaintiff that these circumstances warrant the inference that Kindle made the cut. at Christiansburg and failed to anchor the rear cars.

But .contrary to the inferences which may arise from the circumstances and facts shown by plaintiff's witness, we have the direct and positive testimony of the members of the train crew that the eighteenth car was cut from the rear portion of the train near the Shelby switch and that Webber made the cut.

Plaintiff relies upon certain cases cited in brief dealing with circumstantial evidence and inferences to be drawn from the circumstances. But in such cases it appears that the direct and postive testimony was meager or at least insufficient to overcome the presumptions or inferences drawn from the circumstances or proven facts. Among the cases cited and relied on is. Perry's Adm'x v. Inter-Southern Life Ins. Co., 248 Ky. 491, 497, 58 S. W. (2d) 906, in that case Perry was found dead on the streets of Louisville and there were no eyewitnesses or other direct evidence accounting for the cause of his death. The cause or manner of his death could only be inferred from circumstantial evidence alone, and it was held that in the absence of any direct testimony tending to account for his death, the inferences drawn from the circumstances were .sufficient to warrant a submission of the case to the jury. In the case at bar we have the direct and positive tes-

timony of a number of witnesses which is contrary to the inferences to be drawn from the circumstances and facts shown by plaintiff's witnesses. It is a settled rule of evidence that a rebuttable inference of fact must yield to the positive and uncontradicted testimony of unimpeached witnesses which tends to show that the facts sought to be inferred did not exist. Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819, and cases cited therein; Southern R. Co. v. Walters, 284 U. S. 190, 52 S. Ct. 58, 76 L. Ed. 239; Louisville & N. R. Co. v. Winkler, 162 Ky. 843, 173 S. W. 151.

Conceding without deciding that there was a cut of the train made at Christiansburg station, yet it is not shown that Webber did not cut the eighteenth car from the certain other cars in the rear, near the Shelby switch as testified to by the members of the train crew.

Thus, we have the direct, positive, and uncontradicted testimony of a number of the members of the train crew that Webber cut the train at the time and place testified to by them, and this evidence is wholly uncontradicted except by inferences to be drawn from the testimony of plaintiff's witnesses who testified that a second portion of the train passed down the track following that portion which preceded it with the engine attached. Even though the evidence of plaintiff's witnesses was sufficient to warrant the jury (had the case been submitted to it) to believe that there was a cut of the train made at Christiansburg, yet there was no evidence which would have warranted the jury to find that Webber did not make the cut at the time and place testified to by the members of the train crew, which lead to and resulted in his death.

Webber's administratrix argues that:

"The conductor negligently failed to see that the dead portion of the train left on this descending grade was securely fastened, and [2] that the rear brakeman, after cutting the train, negligently failed to properly secure the dead part of it left on the descending grade."

In discussing a similar question, we said:

"We cannot see that the failure of the conductor to personally supervise the deceased's actions on

the switching of the cars under the circumstances constituted any negligence on the part of the master.''

Louisville & N. R. Co. v. Noble's Adm'x, 246 Ky. 86, 54 S. W. (2d) 636, 639.

The theory that the rear brakeman cut the train is predicated on a mere presumption. Being the middle brakeman, it was Webber's duty to cut the train whether it was cut while it was at the point designated in the testimony of Mildred Taylor, George Nettles, Mary Hall, and others, or it was cut at the point located by the testimony of the trainmen. The fact that it was the duty of Webber to cut the train at either point, coupled with the fact that he rode the rear of the train at the time he was killed, in connection with the evidence of the trainmen, is sufficient to overcome the presumption that the rear brakeman did the cutting at either point.

In view of the rule that a rebuttable inference of fact must yield to direct and positive evidence contrary to such inference, we are constrained to the view that the plaintiff failed to show any negligence on part of defendant, its servants, or employees, and that the court did not err in directing a verdict for the defendant.

The judgment is affirmed.

The whole court sitting.