## Jacobs's Exor. v. Meyers.

(Decided November 7, 1919.)

## Appeal from McCracken Circuit Court.

1.  Deeds—Conveyance by Infirm Person—Burden of Proof.—The law looks with suspicion upon the transfer of property by persons mentally or physically infirm to those having custody of or residing with them, and where there exists between the transferrer and transferee the relationship of confidence and trust, in a suit seeking the cancellation of the conveyance, the burden is on the one benefited thereby to show that the transaction was freely and voluntarily entered into by the one whose capacity is questioned, and that it was without undue influence exercised upon him, and free from any other vitiating facts or circumstances.

2.  Deeds—Relation of Confidence—Burden of Proof.—Where a grantor was ninety-three years old, and the grantee was a nurse and housekeeper for her, and the proof showed that there was great friendship and confidence existing between them, the grantee sustained a confidential relation toward the grantor, requiring her to assume the burden of showing the fairness of the transaction and its freedom from undue influence.

3.  Appeal and Error—Finding of Chancellor.—The finding of a chancellor upon an issue of fact will not be disturbed if there is a doubt in the mind of this court as to the truth of the matter, but if his judgment is against the preponderance of the evidence, this court will set it aside and determine the facts according to the proof.

4.  Deeds—Action to Set Aside Conveyance—Undue Influence.—Evidence examined in this case and found that the judgment of the court dismissing the petition which was filed to set aside a conveyance for undue influence and mental incapacity of the grantor is against the preponderance of the evidence, and should be and it is reversed with directions to sustain the prayer of the petition.

WHEELER & HUGHES for appellant.

EATON & BOYD for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On May 23, 1917, Mrs. Josephine B. Jacob, for many years a childless widow, and who was nearly ninety-three years of age, executed a deed to the appellee and defendant below, Mrs. Cornelia Meyers, conveying to her a house and lot in the city of Paducah in which the grantor resided, and being all of the real property which she possessed, reserving, however, the right for the grantor to occupy the property during her life. The

consideration expressed in the deed was one dollar and faithful services rendered by the grantee to the grantor. Three days less than five months after the execution of the deed, the grantor died, leaving a will which was executed on October 22, 1913, but to which there was added a codicil of date January 9, 1914, in which appellant and plaintiff below, Robert L. Reeves, was nominated as executor.

After the death of Mrs. Jacob he qualified and instituted this suit against defendant, seeking to cancel the deed of May 23, 1917, upon the ground that it was fraudulently procured through the exercise of undue influence, and that the grantor was mentally disqualified to execute it. The answer denied the allegations of the petition and upon trial it was dismissed, and to reverse that judgment the executor prosecutes this appeal.

The defendant was also a widow and had been living with the decedent, who lived alone, for something like eight years before the deed was executed. She was employed to and discharged the duties of housekeeper and nurse for Mrs. Jacob, and there grew quite an intimate relation between them. That the defendant discharged her duties well there can be no doubt from this record. She soon ingratiated herself in the affections of the deceased to such an extent that she assumed the responsibility of transacting practically all of the business of Mrs. Jacob, especially everything pertaining to the running of the household. She bought and paid for goods, and exercised general control of the premises. She was serving under a contract by which she was paid $14.00 per week and her board and lodging, which we know from the current history of the times was amply remunerative for such services, especially since it is shown that for much of the time Mrs. Jacob did not require an excessive amount of attention, and defendant's duties were no greater than were usual and ordinary in such cases. There can be no doubt that there existed a confidential relationship between the deceased and the defendant at the time of the execution of the deed. The law, as gathered from the experience of the ages, recognizes the frailty of human nature and the fact that human acts and conduct are frequently directed by selfish motives. Hence, equity, which has for its purpose the administration of justice, demands and requires of one seeking to uphold a contract where such confidential relationship exists between the contracting parties, to establish by

the clearest proof that the transaction is fair and free from fraud or undue influence. The rule as stated in the recent case of Davidson v. Davidson, 180 Ky. 190, is that:

"The law looks with suspicion upon transactions between persons sustaining confidential relation toward each other, and if the grantor is old and physically infirm, and transfers his property to one sustaining such confidential relation, and who has custody of or resides with him, the burden is cast upon the grantee to show that the transaction was freely and voluntarily entered into, and devoid of any vice rendering it inequitable or unfair. McElwain v. Russell, 11 Ky. Law Rep. 649; Smith v. Snowden, 96 Ky. 32; Shacklette v. Goodall, 151 Ky. 20; Kelly v. Fields, 167 Ky. 796; King v. Burkhart, idem, 424; Miller v. Taylor, 165 Ky. 463; Talbott v. Bedford, 21 Ky. Law Rep. 897; Koger v. Koger, 29 Ky. Law Rep. 235; Hall v. Orme, 146 Ky. 467; Bradley v. Bradley, 28 Ky. Law Rep. 1261; Gross v. Courtney, 161 Ky. 152; Herzog v. Gibson, 170 Ky. 325; Bozarth v. Banister, 143 Ky. 136, and Shields v. Burge, 171 Ky. 149."

The cases referred to abundantly sustain the excerpt from the Davidson case, and some of them, particularly the case of Kelly v. Fields, (as well as the Davidson case), say that if the circumstances are such as to afford an opportunity for the exercise of undue influence, and the transaction in its nature is such as to excite suspicion, the burden will be cast upon the one asserting the validity of the contract to show the absence of such influence. It remains to be seen whether the facts as disclosed by the record bring the case within the operation of that rule; and if so, whether the defendant has properly discharged the burden which it casts upon her.

The defendant introduced twenty-two witnesses, besides herself, one of whom was the attorney who prepared the deed and who had never seen the grantor until that occasion when called by the defendant to perform that service. She had previously applied to two others to prepare the deed, but they were acquainted with the grantor and with her physical and mental condition and declined to do so. Some of the witnesses introduced by the defendant state that according to their opinion "Mrs. Jacob's mind was all right." Others state that it was all right "for one of her age," while others said that it was all right so far as they could tell,

but that she was forgetful at times. Three of the witnesses who testified for defendant had been called to the house at her solicitation for the express purpose of testifying to the mental condition of the grantor at the time she executed the deed. At least one of those witnesses had never been in the house before, and all of them lived a considerable distance from the deceased and saw her very infrequently. About the time of the execution of the deed the defendant called in Dr. Blythe, ostensibly for the purpose of seeing her son, but whether the latter was afflicted, and if so, to what extent, does not appear. At any rate, at least twice thereafter the defendant consulted with Dr. Blythe as to his opinion of the mental soundness of the grantor, who was (and had been for some time) partially deaf and partially blind. Much of the conversations carried on by the deceased with those who would visit her in her home were with the aid of the defendant, who it appears could make herself better understood than those less familiar with the deceased and her ailments. For a large portion of the time the deceased was confined to her bed, and when not so confined she would occupy a chair, not being able to walk about the premises.

Although it is not shown that defendant had full charge of, she at least had access to the box containing the private papers of the deceased, and frequently when neighbors would visit the place the conversation would soon be directed to the affection which the grantor had for the defendant, and her intention and desire to make the conveyance in question. These conversations would also frequently refer to the relatives of the deceased as being grasping and anxious in their desires to prevent the conveyance being made.

The witness, Dr. Blythe, the specially called-in physician, does not fully sustain the defendant's cause, since he was in the presence of the deceased but a short while, and did not have his attention specifically directed to any particular matter. He said: "I do not recall anything in the conversations that may have taken place to lead me to conclude that she (deceased) was devoid of sufficient mental power to know her own actions. . . . I do not recall any outstanding feature except extreme old age with the infirmities of old age."

Another fact appearing in defendant's testimony is that prior to the execution of the deed, Mrs. Jacob had executed a codicil to her will, whereby she devised to the

defendant the sum of $2,000.00, and the defendant procured the presence of the witnesses to that document. Other circumstances bearing more or less upon the issue appear in defendant's proof, but it is doubtful whether she fully met, by the testimony she introduced, the requirements of the rule, *supra,* without considering the testimony offered by plaintiff.

Not only do we find support in defendant's proof alone for the charge of undue influence, but we have the fact of enfeebled old age coming in contact with activity on the part of defendant in procuring the execution of the two instruments (the codicil and the deed). This is further augmented by the mobilization of witnesses for the purpose of service in a prospective legal battle when, if normal conditions existed as defendant contends, there neither was nor could be any *casus belli.*

There is no intimation in the record that any of the collateral kin of the deceased were solicitous about the disposition of her property, or manifested in the least any selfish desires in that regard, or any wish to prevent her from disposing of her property in any manner she saw proper. Neither does it appear that they were negligent in visiting or looking after the deceased, or that they had done anything to impair the relationship theretofore existing between them. So that if the deceased was suspicious of her relatives (as charged by the defendant), that suspicion arose from some source other than from their actions and conduct.

When we turn to the testimony offered by plaintiff, we find the most intimate acquaintances of the deceased testifying that she was "exceedingly and distressingly feeble"; that she would forget the name of the person with whom she was talking, although she may have known them all of her life. To one witness the deceased said: "You know, Lucy, I have no mind now, and I haven't had for two or three years, it is gone." Another witness said that her mind had been practically gone for four years. Another said: "I do not think she had mind enough to transact any business for two or three years before she passed away; her mind was weak." They said, also, that she was childish in her ways and easily susceptible to the influence of those associated with her. The witnesses just referred to were not related in any way to the deceased, and had no interest in the litigation.

Dr. Caldwell, who had been her family physician for years, testified that "so far as her mind was concerned, at one time her mind was all right, but she had no recollection from one thing to another; five minutes after she did a thing she didn't recollect it. She had no power of co-ordination. . . . I don't think she would have known five minutes at a time whether or not she had deeded away her property. . . . She did not have any will of her own. She did not know anything about her house, or the things in it, for months before she died." This witness also testified that for several months prior to her death the deceased would not know when nature had performed its functions.

Relatives of the deceased testified substantially the same as the other witnesses, except that they further stated that in the last illness of the deceased they attempted to procure the services of an additional nurse, and that defendant stubbornly refused and opposed the proposition, saying in substance that before another nurse should come into the house she (defendant) would wade through blood, which fact, however, defendant denied.

Dr. Luten, who married a niece of the deceased, upon being asked whether she had mind and understanding sufficient to execute a deed, said: "I do not think she was capable of doing anything of that kind. Her mind was feeble and had been for ten years. . . . She was feeble in body and mind." Her kinsmen testified that they had never done anything to mar or disturb the pleasant and cordial relationship which existed between them and their aged aunt; but that for some years prior to her death, and after the defendant went to live in the house with her, she appeared to grow distant and cold toward them.

Giving, then, the proper weight to the testimony introduced by plaintiff, and viewing it in the light of the facts developed by defendant's testimony, it would seem almost conclusive that the grantor in the deed did not possess the mental ability to execute it, which the law requires in such cases. Furthermore, all of the opportunities for and earmarks of undue influence stand out prominently in the case. Whether it was exercised or not, we can not tell. Our conclusions must be based upon what we find in the record, and from this source the evidence, to say the least of it, greatly preponderates in favor of the contentions of plaintiff that the deed was

procured by undue influence and was executed at a time when the grantor was mentally incapacitated to do so.

In cases like this the court is governed by a different rule from the one prevailing in ordinary cases where the verdict of a properly instructed jury is involved. In such case we are not authorized to set aside the finding of facts by the jury, unless the verdict is flagrantly against the evidence, but in equity cases we not only have the right, but it is our duty to disregard the finding of the chancellor upon an issue of fact if the evidence preponderates against it. It is because of the difference in the rules, as well as the difference in dates to which the two inquiries related, that this case should not be governed by the one of the same style involving the validity of the codicil by which defendant was devised $2,000.00, decided by this court on October 24, 1919. The codicil involved in that case was executed February 8, 1915, nearly two years and four months prior to the date of the deed, the validity of which is involved in this case.

Under the law and facts as we have found them, we are bound to conclude that the learned chancellor was in error in dismissing the petition, and the judgment appealed from is reversed; with directions to set it aside and sustain the prayer of the petition, and for proceedings consistent with this opinion.