## Nolan, et al. v. Howard, et al.

(Decided May 27, 1927.)

## Appeal from Harlan Circuit Court.

1. **Deeds.**—Evidence held to show that execution of deed was not free, voluntary act of grantor.
2. **Trusts.**—Equity will convert party obtaining title by threats, influence, or use of confidential relation toward owner, into trustee.
3. **Trusts.**—Constructive trusts differ from other trusts, in that they are not within party's intent or contemplation when contract, from which they are construed by courts, is made, but thrust on party contrary to his intentions and against his consent; courts of equity having large jurisdiction over all matters of trust and, confidence.
4. **Descent and Distribution.**—Daughter of one executing deed to one of his two sons and another daughter's husband under duress held entitled, after grantor's death, to recover from his son-in-law one-fourth of property, which latter still had after conveyances among grantees and other brother, or, if indivisible, to such share of proceeds of sale thereof.
5. **Compromise and Settlement.**—Deed of part of land, acquired by grantor after conveyance thereof to his brother and brother-in-law by grantor's and grantee's father, since deceased, in full settlement of pending action by grantee for equal division of realty among decedent's children, held not satisfaction in full of plaintiff's claims against all defendants, including brother-in-law, who were not jointly obligated to plaintiff.
6. **Trusts.**—Courts of equity control and direct administration of constructive trusts under deeds obtained by threats or influence, and need not annul such deeds, but may put end to trust by directing or compelling trustee to convey property to proper person.

LEE & SNYDER for appellants.

JAMES H. JEFFRIES for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

Mollie Carter Nolan and her husband, the unsuccessful plaintiffs, have prosecuted this appeal, and are asking this court for relief which was denied them by the trial court. In October, 1924, J. C. Carter died intestate, and left surviving him, as his only children and heirs at law, John B. Carter, Milton Carter, Millie Carter Howard, and Mollie Carter Nolan. He left some little personal property, the whole of which was assigned to

his widow, Betty Carter, under section 1403, Ky. Stats., as exempt from distribution and sale. Formerly J. C. Carter had been a very prosperous man and at one time owned about 1,200 acres of land. His first wife, the mother of these children, died many years ago. About that time, and especially after that time, and until his death, J. C. Carter habitually used whiskey, bromidia, morphine, and other things to such an extent as to seriously affect his business capacity. Within a few years after the death of his first wife, he remarried. He began to waste his estate, and soon he had almost stripped his farm of stock, the improvements on it got out of repair, he had sold 400 acres of the most valuable part of this farm, and had wasted that money in these dissolute habits. His family became alarmed. Conferences were held, in which the situation was discussed. At length, on August 8, 1905, J. C. Carter proposed to a brother-in-law, Wilse Hensley, to sell him the 800 acres he had remaining, for $7,000. Hensley doubted the capacity of J. C. Carter, but decided to accept the proposition, and had Carter's brother-in-law Cawood to prepare a bond for a deed. Hensley gave J. C. Carter a check for $1,000 upon this purchase price, and Carter obligated himself to convey the property to Hensley and to put him in possession of it on January 1, 1906, when he was to pay the remainder. Gibson Carter and B. W. Carter, of Virginia, brothers of J. C. Carter, had previously endeavored to induce J. C. Carter to quit these habits, but had been unable to do so. They were now summoned in again, and these two brothers and the children of J. C. Carter met with J. C. Carter at the home of the defendant H. H. Howard about the middle of August, 1905. At this family meeting, J. C. Carter was told that he would have to arrange his property in some way so that it could be preserved, and he could not waste it, or an effort would be made to have a committee appointed for him. It appears that during the course of these discussions an attorney was employed and preparations made to begin proceedings for the appointment of a committee, of which he was advised. Thereupon J. C. Carter yielded, and on August 16, 1905, signed a paper conveying to his son John B. Carter, and his son-in-law Howard, at whose house this meeting was had, the remainder of his land, which was supposed to be about 800 acres. From this conveyance there was excepted a life estate in this prop-

erty in favor of J. C. Carter. The deed contained this recital:

"It is his intention to provide for himself during his natural life and to make an equal division of the purchase money for said land at his death after charging said John B. Carter and Millie Howard with advancements heretofore made to them."

H. H. Howard evidently realized the mental condition of J. C. Carter, and he had a paper prepared, which was signed by the four children of J. C. Carter, and by the wives and husbands of those that were married, in which we find this provision:

"We each request said J. B. Carter and H. H. Howard to purchase said land at that price, not only for the reasons that we are to receive part of the purchase price, but that said J. C. Carter may better his condition and be well provided for."

It is agreed in this record that, previous to this time, J. C. Carter had advanced to his son John B. Carter $200 and to his daughter, the defendant Millie Howard, $600 and in this agreement signed by the children, and in the deed which J. C. Carter made to John B. Carter and H. H. Howard, it was provided that the $7,000 named as the consideration should be paid as follows: $1,000 to be paid in cash to J. C. Carter, and at his death the remaining $6,000 was to be divided as follows: $1,700 to Milton Carter; $1,700 to the plaintiff Mollie Carter Nolan; $1,500 to John B. Carter; and $1,100 to Millie Howard.

A careful examination of the evidence about the acts and conduct of these parties at and after the time this deed was made convinces us that this was not a free and voluntary act on the part of J. C. Carter. There are several things that convince us that this was the case. First, Carter had already made a sale of this property to his brother-in-law for $7,000, and he had in his possession a check for $1,000 that had been paid him on it. In order to induce him to surrender that check, doubtless, it was necessary to give him some assurance that, if he would enter into this arrangement, $1,000 would be paid him to meet his immediate needs, and, doubtlessly, the old man had not entirely forgotten his obligations to his children. He had already advanced $200 to J. B. Carter and $600 to Millie Carter Howard, the wife of the grantee

H. H. Howard, and the old man wanted to have some say about how this property was to be divided, and what we have written above about how the remaining $6,000 was to be divided was probably inserted to humor the old man.

It is well settled that, if a party make use of some influential or confidential relation which he holds toward the owner of the legal title, or, by threats or influence, obtains from the holder of the legal title a conveyance thereof, equity will convert a party obtaining title under such circumstances into a trustee. Such trusts are called constructive trusts. They differ from other trusts in this, that they are not within the intention or contemplation of the party at the time the contract is made, from which they are construed by the courts, but are thrust upon a party contrary to his intentions and against his consent. The reason for this is that courts of equity have a large jurisdiction over all matters of trust and confidence. This old man was taken to task about his habits, about wheedling away his farm, his two brothers summoned from a distance, and his children gathered in, all demanding that something be done. A procedure to appoint a committee for him was threatened, and papers therefor prepared, and under such circumstances we can well understand why the old man gave in. The grantees Carter and Howard and the other members of J. C. Carter's family never seemed to take this deed very seriously. Nobody, so far as this record discloses, has ever been paid one cent of the $6,000 that was to be divided, and only a small part of the $1,000 that was to be paid the old man was ever shown to have been paid him. Everything indicates they were just humoring him along to get this title away from him and into such shape that he could not waste this property. Addressing ourselves particularly to the conduct of Howard, we find that, within a few days thereafter, he had hunted up W. S. Hensley, who lived some distance away, and this is taken from the evidence of Hensley, and was not denied by Howard:

> "He come down to my house and told me the circumstances. He came down to get that bond. I believe he said that I knew the land was worth more. He said he wasn't in his right mind and wanted me to give it back. We talked everything over. He

told me that John would prove that Mr. Carter wasn't in his right mind, and it would give me trouble. I withdrew; I didn't want any trouble. I wanted to keep it very bad. That is the way I remembered it. I think he told me if I didn't do it, he and John Carter wanted a contract, and tried to get the bond from me and take the land. After I talked to Hamp, I knew they just wanted the land back for the old man. He said if I didn't do that, John would give me trouble, because the old man wasn't in his right mind. He said, 'You know it without me telling you, and you better do it.' I gave it up to him.''

Since obtaining this conveyance, the grantees H. H. Howard and J. B. Carter and his brother, Milton Carter, have, by divers conveyances, divided and traded this property around among themselves, so that when J. C. Carter died each of these three had practically one-third of this land, and Mrs. Nolan, previous to the institution of this suit, had received not one inch of land or one dollar in money. When she began this suit, her brothers Milton Carter and J. B. Carter, in recognition of her rights, each made to her a conveyance of substantial parts of what they had, by which Mrs. Nolan was satisfied as to them, and the action was dismissed as to them. Her brother-in-law, Howard, however, insisted on his pound of flesh, and has conceded to her no right to either land or money. He has 256 acres of this land, which is practically one-third of the 800-acre tract. Mrs. Nolan was entitled to one-fourth of her father's estate, and, as against Howard, she is entitled to one-fourth of the one-third of this property which he has. The trial court should have awarded to her one-fourth of the 256 acres Howard has, and, upon the return of this case, that shall be done. If this 256 acres is not divisible, then the court will sell it, and, out of the proceeds thereof, will allot to Mrs. Nolan what she is entitled to as indicated above.

Among the defenses interposed by Howard, he has pleaded that in the conveyance made Mrs. Nolan by Milton Carter this appears:

That said party of the first part for and in consideration of the sum of $1 cash paid, and the further consideration of settlement in full of an action now pending in the Harlan circuit court in which Mollie Nolan is plaintiff and H. H. Howard, et al., de-

fendant, which action is seeking an equal division of
the real estate lately owned by J. C. Carter, the re-
ceipt of which is hereby acknowledged, do hereby sell
and convey.''

This, Howard contends, was a satisfaction in full of
all of Mrs. Nolan's claims against all the defendants, but
we cannot so regard it, because there was no joint obliga-
tion to Mrs. Nolan from the defendants, so that a settle-
ment by one could be held to be a settlement for all, and it
was clearly not the purpose of Mrs. Nolan in settling
with J. C. Carter and Milton Carter by accepting from
them conveyances of portions of what they had to settle
the entire lawsuit, and, besides, there is nothing to indi-
cate that there was any purpose on the part of either of
her brothers to settle Mrs. Nolan's claim, except in so far
as it affected them, and the land which they had received
from the J. C. Carter estate, and, further, no considera-
tion ever passed from H. H. Howard to Mrs. Nolan in
making such settlement. Howard has cited the case of
Cunningham v. Standard Const. Co., 134 Ky. 198, 119
S. W. 765, but that was a case wherein the defendant him-
self had tendered an amount in satisfaction of the claim
and it had been accepted, and that was held to be an ac-
cord and satisfaction. The case of Williamson v. Mc-
Ginnis, 50 Ky. (11 B. Mon.) 74, 52 Am. Dec. 561, cited by
Howard, was joint obligation on a note. One of the
obligors paid McGinnis $180, the receipt of which Mc-
Ginnis acknowledged by an indorsement written on the
back of the note, in consideration of which he then and
there released that obligor forever. In that case, the
court held that the absolute release of one of several joint
obligors is a release as to the others, but that is not the
question we have before us. The question we have here
is more like the question we had in the cases of King, et
al. v. Burkhart, et al., 167 Ky. 424, 180 S. W. 534, Jacobs'
Ex'r v. Meyers, 185 Ky. 594, 215 S. W. 532, Gatlin, et al.
v. Allen, et al., 174 Ky. 225, 192 S. W. 26, and the cases
cited in those opinions.

It will not be necessary for us to set aside these
deeds, for courts of equity control and direct the adminis-
tration of such constructive trusts as this one, and, while,
in certain cases, they annul such deeds, they can also put
an end to such trusts by directing or compelling the
trustee to convey the property to the proper person. By

the procedure we have outlined above, this will be accomplished.

The judgment is reversed, and the cause remanded for further proceedings as indicated.