*Todd* for plaintiff; *Morehead and Reed* for defendants.

---

## Cook *vs* Colyer's Administrator.

ERROR TO THE ROCKCASTLE CIRCUIT COURT.

*Mortgagor and mortgagee. Usury. Evidence.*

CHIEF JUSTICE ROBERTSON delivered the Opinion of the Court.

CHANCERY.

*Case* 34.

*September* 30.

The case stated.

IN September, 1836, *Loftus Cook* filed a bill in chancery against the representatives of *John Colyer*, (who died in 1832,) for redeeming a tract of land and a slave, *Preston*, alleged to have been mortgaged to the decedent by the complainant, in the year 1830.

The Circuit Court dismissed the bill without prejudice as to the land, and absolutely as to the slave.

As *Colyer's* heirs admitted nothing in their answer, and no mortgage or other document concerning the land was exhibited, the decree of dismission, without prejudice as to the land, was as favorable to the complainant as he could have expected.

But the absolute dismission as to the slave was, in our judgment, erroneous.

It appears that the slave had been delivered to Colyer in June, 1830, to work for the use of money which he had loaned to Cook, and for securing which Cook had given him a lien on the slave, as well as on his land—that in November of the same year, one *Slaughter*, as agent of *Cook*, executed to *Colyer* a writing purporting on its face to be an absolute bill of sale of the slave, for the recited consideration of $424, the slave being then worth, according to the proof, at least $800, and *Cook* being peculiarly attached to him and having refused about that time, to sell him for $750—that *Colyer* was an intelligent man and had great influence over *Cook*, who looked up to him as a friend and counsellor, and who was, also, an ignorant, reckless, and credulous man, oppressed by debt—that Colyer frequently admitted, be-

COOK
vs
COLYER'S AD'R.

tween the date of the bill of sale and his death; that he still held the slave as security for money and for *Cook's* benefit, and that, for the purpose of securing to himself the undisturbed enjoyment of the use of the slave, which was worth much more than legal interest on the loan, and also for preventing a loss to *Cook* by a sale of his equity of redemption by any of *Cook's* execution creditors, he (*Colyer*) had *"procured"* from him (*Cook*) the bill of sale purporting to be unconditional.

It appears also, from the answer of *Colyer's* administrator, that he had in his possession, when that answer was filed, a mortgage which had been executed by *Cook* to *Colyer* in June, 1830, on the slave *Preston*, for $424, *the precise sum recited as the consideration of the bill of sale of November, 1830*; and it clearly appears also, that *usury* was exacted in the loan.

Where money is loaned at usury and a mortgage given to secure it, though the party afterwards execute a bill of sale by an agent, yet if the authority of the agent be doubtful and the price inadequate, the Chancellor will hear parol proof to unfold the whole transaction, to show that a mortgage only was intended; and, in such a case, where the mortgagee has violated a confidence and seeks to hold the absolute property, the Chancellor will permit a redemption.

The exaction of usury and the doubtfulnes at least of *Slaughter's* authority to execute an absolute bill of sale for *Cook*, opened that document to explanation and contradiction by parol testimony. There being neither proof nor presumption that any new consideration, in addition to the loan, was ever advanced by *Colyer*, a court of equity would not incline to consider the conversion of the mortgage into an absolute sale, as closing the equity of redemption, had the parties intended such transmutation. But it is, we think, evident that there was no such intention as between the parties themselves; and, for the reasons already suggested, the extraneous testimony was admissible for the purpose of showing that a mortgage, and not an absolute sale, was mutually intended.

But it is argued that *Cook*, as well as *Colyer*, designed a fraud on the creditors of the former in the ostensible sale of *Preston*, and that, therefore, being *in pari delicto*, he cannot be entitled to the aid of a court of equity, which will not help to extricate a party from the consequences of his own voluntary fraud. This is a formidable consideration; but we are inclined to think that it is not conclusively applicable to this case.

*In pari delicto, potier est conditio de fendentis, does not apply to*

The salutary principle of equity, now urged in bar of *Cook's* right to relief, should not be extended beyond the reason and policy which dictated it; and it does not,

therefore, necessarily apply to a case in which the defending party had himself first conceived the fraud for his own benefit, and either by his artifice or influence induced the complaining party to concur with him in the attempted collusion. And such, as we are strongly inclined to apprehend, is the true character of the transaction between these parties. It does not appear that *Cook* had ever contemplated or desired any fraudulent device for defeating or delaying his creditors, or that he even understood the object or effect of an absolute bill of sale; and it does appear that *Colyer*, for his own obvious benefit as well perhaps as for that of *Cook*, conceived and proposed a scheme for securing the slave in his own possession, and urged it successfully on *Cook*, who seems, with a childlike simplicity, to have confided in his judgment, integrity, and friendship; and we do not even feel bound to infer that *Cook*, when he finally consented that *Colyer* and *Slaughter* might do whatever they deemed best, knew precisely what was intended or would be done, or that, whatever it might be, it would be a fraud, either actual or constructive.

We are, therefore, indisposed to subject *Cook* as a suitable victim to the rule, *"in pari delicto potior est conditio defendentis;"* were we to do so, we should, as we think, pervert the principle to an end inconsistent with its reason and subversive of its just and wholesome policy, and make it an engine for perpetrating, rather than preventing the most pernicious and fraudulent of all kinds of frauds.

We are, therefore, of the opinion that *Cook* is entitled to redeem the slave, Preston, upon equitable terms—accounting for the $424 as principal, and legal interest thereon, and being credited with the annual money value of Preston's services to Colyer as a provident and humane man, and opposed to slavery, as he seems to have been.

The lapse of time does not bar the claim to relief, because it does not appear that Colyer ever held the slave adversely in fact to Cook.

And as the alleged mortgage on the land and lien on the slave seem to have been intended as securities for the

same loan, it would be proper, on the return of the cause to the Circuit Court, to allow *Cook* to amend his bill so as to litigate his asserted right to redeem the land also, if he shall desire ever to do so.

Decree reversed and cause remanded for such further proceedings and decree as shall be proper, consistently with the foregoing opinion.

*Owsley* for plaintiff; *Harlan* for defendant.