## Virginia Iron, Coal & Coke Company v. Crigger.

(Decided March 12, 1918.)

### Appeal from Pike Circuit Court.

1. Cancellation of Instruments—Deeds—Fraud—Degree of Proof Required.—The cancellation of an executed contract is an exercise of the most extraordinary power by a court of equity which ought not to be to be exercised except in a clear case and never for an alleged fraud, unless the fraud be made clearly to appear.

2. Cancellation of Instruments — Deeds — Fraud — Evidence — Sufficiency.—In an action to cancel a deed on the ground of fraud, evidence examined and held insufficient to authorize the relief asked.

AUXIER, HARMAN & FRANCIS for appellant.

SAM S. STOWERS and F. W. STOWERS for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

On August 27, 1872, Benjamin F. Williamson conveyed to Harman Crigger and his wife, Mary, 121 acres of land situated on Dick's Fork of Big Creek in Pike county. A few years later Mary Crigger died leaving her son, Benjamin Crigger, as her only heir at law. Thereafter, Harman Crigger married again and in the month of September, 1887, he and his wife conveyed to John J. Stewart, trustee, all the coal and other minerals with the usual mining privileges, underlying the entire tract, with covenants of general warranty. Thereafter the Virginia Iron, Coal & Coke Company acquired the title conveyed to Stewart, trustee. On October 12, 1909, Harman Crigger and wife, and Benjamin Crigger and wife, in consideration of the sum of $100.00 cash, $90

being paid to Harman Crigger and $10.00 to Benjamin Crigger, executed and delivered to the Virginia Iron, Coal & Coke Company, a deed of release and conveyance by which they conveyed and quit claimed to that company, all their right, title and interest in and to all the minerals underlying the entire tract of 121 acres, and granted in more specific terms the usual mining privileges. This deed was lodged for record on October 13, 1909, and recorded on December 4, 1909. After the death of his father and about six and one-half years after the conveyance was made, Benjamin Crigger brought this suit to set aside the conveyance on the ground of fraud and to recover an undivided one-half interest in the minerals. He was granted the relief prayed for, and the Virginia Iron, Coal & Coke Company appeals.

According to Benjamin Crigger's evidence, he was about thirty-seven years of age when the conveyance in question was executed. He did not know that he owned an undivided one-half interest in the property. He lived twenty miles from Pikeville, had been there only five or six times, and had had no experience in business matters. The agent of the company who procured the deed, represented to him that the only purpose of the deed was to enlarge the mining privileges. He did not learn that he had conveyed his interest in the minerals until he began searching the records after the death of his father. If he had known that he was conveying his interest in the minerals, he would not have executed the deed. On the cross-examination he testified that his father asked him to sign the deed. He talked to his father and the agents about it. They said the company wanted more mining privileges. Mr. Flue never explained the whole thing to him. He didn't have time to fool with Flue, but wanted to get back to work. The agents offered to let him read the deed but he told them that he couldn't read himself. He could read, however, by spelling out the words. He admitted that his father took him off and talked to him about the deed and told him that he was to get $10.00 while his father got $90.00. Harman Crigger, Jr., a half brother of Benjamin, testified that he was present when the transaction took place but didn't hear all their talk. He heard some of the talk and it was his understanding that the agents said that all they wanted was additional mining privileges. His

brother was ignorant and didn't know much about business transactions. On cross-examination he stated that he was not present when his brother signed the deed.

For the appellant, J. W. Reedy testified as follows: In the year 1909, he was appellant's field agent. He and Mr. Flue, another representative of appellant, ascertained that the title to the Crigger minerals was defective because the one-half undivided interest of Benjamin Crigger was not covered by the deed of 1887. He made one trip to the Crigger residence and stayed all night. He told them what he wanted and they demanded a consideration of $100.00. Upon his return Mr. Flue prepared a deed leaving the consideration blank. They then went to the Crigger home. He and Flue and the Criggers discussed the matter at length. At that time Benjamin Crigger was told that he had a one-half interest in the property. The deed was read over in the presence of Benjamin and his wife. While the matter was under consideration, Harman Crigger and Benjamin went off and agreed on the price. When they returned they told him and Flue to write the checks, $90.00 to Harman Crigger and $10.00 to Benjamin Crigger. At the time he testified, Reedy was no longer in the appellant's employ. W. G. Flue, an attorney of Prestonburg, testified as follows: In the year 1909, he was employed by appellant to look after land titles and do abstracting. In examining the company's abstracts, he ascertained that its title to the minerals on the Crigger tract was defective because Benjamin Crigger had not conveyed his interest. After Mr. Reedy visited the Criggers, witness prepared a deed and he and Mr. Reedy went to the Crigger house. He there explained to Benjamin Crigger that he had inherited from his mother a half interest in the land. After remaining there and discussing the matter for some time, Harman Crigger and Benjamin went off and talked by themselves. When they returned they said they would take $100.00, $90.00 of which was to be paid to Harman and $10.00 to Benjamin. The deed was then read to the parties and executed by Harman Crigger and Benjamin Crigger. They then went to where Benjamin's wife stayed and she executed and acknowledged the deed after it had been read and explained to her. During the conversation, Harman Crigger told his son that when he conveyed the minerals he thought he owned it all in fee and wanted the

company made whole. In rebuttal Benjamin Crigger denied that the agents told him that he had an interest in the land. He also denied that he and his father went off and had a talk about the matter, or that he was present when the deed was read and explained to his wife. He also stated that his father did not tell him that when he conveyed the minerals he thought he owned it in fee and wanted the company made whole.

It will be observed that while plaintiff claims that the agents asked him to execute the deed for the sole purpose of increasing the mining privileges, and that the deed was not read to him or his interest in the land explained to him, he admitted that he could read by spelling out the words and that the agents offered to let him read the deed but he told them he couldn't read it himself. It further appears that although he subsequently attempted to deny the facts, he admitted that his father asked him to make the deed and that his father told him that he was to receive $90.00 while plaintiff was to receive $10.00. The testimony of his half-brother is not material because the latter was not present during all the conversation. On the other hand, the two agents of the company, who are no longer in its employ, both testified that plaintiff was told that he had a half interest in the minerals, and that the deed in question was read over to him before he signed and acknowledged it. It will thus be seen that the decided weight of the testimony is to the effect that plaintiff thoroughly understood that he was conveying his interest in the minerals. Nor do we regard the gross inadequacy of price as a badge of fraud under the particular circumstances of this case. Here plaintiff's father owned one-half of the property while plaintiff owned the other half, subject to his father's curtesy therein. Instead of the father's conveying his half of the mineral's by the deed of 1887, he conveyed all the minerals under the entire tract with covenants of general warranty. Plaintiff himself was therefore liable on the warranty to the extent of assets that he might receive from his father. Under these circumstances, plaintiff and his father for the purpose of making the warranty good, agreed to convey all the minerals underlying the land, as well as more specific mining privileges. The offer to convey for $100.00 was the joint offer of both. Appellant's agents were not concerned as to how the

consideration should be apportioned. This was agreed to by plaintiff and his father. Thus the consideration for the conveyance was not only the sum of $100.00, but a release of both father and son from any liability on the father's warranty. We have frequently ruled that the cancellation of an executed contract is the exercise of the most extraordinary power by a court of equity which ought not to be exercised except in a clear case and never for an alleged fraud, unless the fraud be made clearly to appear. Cole v. Young, 167 Ky. 600, 181 S. W. 177; Culton v. Asher, 149 Ky. 659, 149 S. W. 946. Viewing the evidence in the light of this rule we conclude that it is insufficient to authorize a cancellation of the deed in question on the ground of fraud.

Judgment reversed and cause remanded with directions to dismiss the petition.