## Coffey v. Coffey.

(Decided December 17, 1929.)

O. B. BERTRAM and W. J. CHUMBLEY for appellant.

ROLLIN HURT and ROBERT ANTLE for appellees.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Affirming.

The appellant, E. G. Coffey, filed this suit to evict his brother J. S. Coffey and his wife, Bertha, from the possession of a farm of about 100 acres in Russell county, claiming title under a deed dated January 31, 1927, from them to himself, for a recited consideration of $3,500. The defendants, who are now appellees, responded by denying the allegations of the plaintiff's right to recover possession of the property, but admitting the execution of the deed. However, they pleaded that the conveyance was without consideration; that they had executed the deed in an effort to defeat the collection of a threatened judgment against Mrs. Coffey, as the result of the fraudulent and deceitful representations on the plaintiff's part and a scheme evolved by him to secure the conveyance. They admit they were in delicto in this matter, but deny that they were in pari delicto. A traverse by reply completed the issue. The chancellor sustained the pleas of defendant, dismissed the petition, annulled the deed, and quieted Bertha Coffey's title to the land.

The two questions then to be determined are: Was the conveyance made for a valuable consideration or with the intent to defraud and defeat collection of the possible judgment? If for the latter purpose, is the grantor entitled to a rescission and relief?

The evidence heard in behalf of defendants, who assumed the burden, tended to prove that they were illiterate and ignorant of the legal effect of the transaction, he was a semi-paralytic, and they were plastic in the hands of the plaintiff, a man of stronger mind upon whose advice they relied. A year or more previous to the date of the deed, J. S. Coffey had had a judgment rendered against him in a slander suit instituted by E. C. Gaines. He had gone to Indianapolis and remained about a year without satisfying that judgment. Upon his return, he had been placed in jail under a writ ad satisfaciendum.

(See section 1661, Statutes.) About this time Gaines instituted a similar suit against Mrs. Coffey. It appears that, shortly after the institution of this suit against Mrs. Coffey, the appellant, E. G. Coffey, suggested that she should convey her property to him until after the danger of judgment had passed, and importuned appellees to do this several times. While her husband was in jail, Mrs. Coffey spent four days and nights at the home of the appellant. When he brought her home, he told her, "They are going to get things against you and the best thing for you to do is to get this land out of your name." It also appears that, just before going to the home of her brother-in-law, some one had scared her in her own home. She was also told that a mob was coming to take her out. Shortly after her husband had been released from jail on application as a pauper and had returned to his home and this slander suit had been filed against her, the appellant came to spend the night with them. During the night their home was stoned, and, upon the appellant being aroused, he declined to go out to see who was perpetrating this outrage, and displayed little interest in the matter. When a few nights later Warren Coffey, son of appellant, was staying with his uncle and aunt to guard their house, a similar stoning was experienced. Mrs. Coffey testified that she looked out of a window and saw the plaintiff in the group of men who were throwing rocks at the house. The next morning she found in her mail box a threatening letter signed "K. K." and addressed to her husband. This letter warned Joseph Coffey that he should "take that woman and git out of the neighborhood."

Shortly after this the appellant came to their home and told the appellees that Mrs. Coffey was bound to lose the lawsuit, and that judgment was going to be taken against her and the place taken away from them. He said that he had talked with her lawyers, and they had told him this, and had advised him that Mrs. Coffey should transfer her property, and suggested that she should sign a note to him for $3,500 and pre-date it, and then to have a deed to the property made to him in satisfaction of that note. When the danger had passed, appellant agreed that he would reconvey it to them. A few days later he produced a note written on rough paper with an indelible pencil, and very crudely drawn and

badly misspelled. He reported to the appellees that Mrs. Coffey's attorney had written this note and urged them to sign it, which they did. This note bears date of July 10, 1924. Three days after they signed this note, the appellant secured a deputy county court clerk to go to their home, and he came also. While there, the deputy clerk wrote the deed in controversy and took the acknowledgments. The appellant handed the note to the clerk, who read it and handed it to appellees; it being said that the deed was being made in satisfaction of that note. Mrs. Coffey's reputation for veracity is attacked, but the evidence was given by unfriendly witnesses and is not very persuasive. There is much in the record corroborating her testimony.

A few days later the appellant went to the clerk's office and there had the scrivener to interpolate in the deed the named consideration of $3,500 cash.

The appellees are supported in their story by the testimony of Harlan Coffey, another brother, who stated that on the 31st of January, 1927, he observed the deputy county court clerk going into the home of appellees, and a moment later met his brother E. G. Coffey on the road and talked with him. He told Harlan that he had been down to get this deed written, and that he was getting things right where he wanted them; that he was going to have pay for what he was doing and good pay for it; that he was going to work on the place to cover up the tracks and keep people from finding out things; and suggested that when he had the place in his name his brother Joseph should get out and leave it. In talking about the slander suit, he said he had beat the other case and was going to beat this one. A daughter of Harlan Coffey, who was a school-teacher, was with her father, and corroborates his testimony respecting this conversation. A neighbor testified that appellant told him in a conversation regarding the lawsuits that he was going to have "things deeded to him and that would stop it." Another neighbor testified that in February, 1927, appellant told him that he had had Mrs. Coffey's attorneys to draw up a note amounting to $3,000 or $3,500 for the purpose of making a temporary deal with the appellees, and that when he had the deed to the property written he told the clerk that it was for cash and charged the note on the payment of the deed.

The Gaines slander suit was not tried, but dismissed. A witness stated he was present a few days before this was done, when Mrs. Coffey asked appellant to return her deed, and he replied that he had undertaken to help her and wuold keep it a while longer, until after court, and see whether or not she won the case.

Several bank cashiers testified as expert witnesses that, from their examination of the anonymous letter placed in Mrs. Coffey's mail box, and the $3,500 note which the appellant admitted having written himself, they were of the opinion that both papers had been written by the same individual, namely, the appellant, E. G. Coffey. Both original papers are in this record, and our examination of them likewise convinces us that he wrote them. The appellant categorically denied the testimony introduced in behalf of the defendant respecting the execution of the note and deed, and especially that part showing that the purpose was to defeat the collection of the threatened judgment.

Appellant's story is this: That his brother wanted some money from him, and that on the day the note was written he carried the $3,500 in his overcoat pocket in five, ten and twenty dollar bills to appellees, and there counted it out to them and wrote the note which they signed while sitting around the fireside. He admits that he did not ask for any security, and accepted the verbal promise of the appellees that, if they did not pay the note, they would deed him the farm. He could not recall how long it had been since this transaction was had, but he clearly remembered they had a fire in the stove and sat around it, and also that the note was correctly dated. He says that he drew his check on his own bank account in Columbia for $2,500 and cashed it, and also obtained $1,000 from a bank in Lebanon, but he could not recall the name of the bank, and never produced his canceled check or anything else to corroborate his story. His bank account at Columbia is before us, and it appears that the appellant had only a small balance during a period long before and after he claimed to have withdrawn and loaned this money to his brother. And overcoats and heating stoves are not very much used in mid-July! Appellant's son testified that he had accompanied his father on the occasion the note was executed, and corroborates him except with respect to the date. He was very evasive

upon cross-examination, and his testimony is entitled to little credence. The plaintiff introduced several witnesses who testified to having seen him on one or more occasions with large rolls of money.

In rebuttal, it was shown by the appellees that the stock of merchandise in appellant's store was not worth in excess of $500; that he had expressed a lack of money upon several occasions and his inability to increase his stock because of it. The farm on which he lived was not of much value. It was further shown that he had reared a family of fifteen children, and had suffered several judgments against him, one for alienating the affections of another man's wife.

The evidence introduced, when weighed with the probabilities, convinces us of the truth of the appellees' claim, and that the chancellor was justified in reaching the conclusion that there was no consideration for this deed, and that its purpose was to hinder and defeat the collection of the threatened judgment, in violation of the statutes against fraudulent conveyances.

So there is before us the second question as to whether or not the grantors were entitled to a rescission of the deed and relief from its effect. This specific question presents the legal proposition as to whether a conveyance of property by the owner during the pendency of an action for the purpose of defeating a judgment that may be rendered therein against him can be set aside at the instance of the grantor when the danger shall have passed away.

While the fraudulent grantee from a sense of moral duty perhaps ought to give back the property to him from whom he received it, yet the law to discourage frauds will not compel him to restore it to the fraudulent grantor. The doctrine has been adjudicated time and again by all authorities that neither party to a fraudulent conveyance of this character can be aided by a court of justice, but that they will be left in exactly that position in which they have placed themselves, and that the grantor will not be permitted to impeach his deed or to revoke or rescind his executed contract. When one confesses a willingness and design to thwart the judgment of the court if it should be contrary to his opinion or wishes, and by a vicious scheme endeavors to hinder and defeat the application of his property to its satisfaction, he will not

ordinarily be permitted to invoke the aid of the very court whose judgment he is undertaking to make value-less by having it restore to him the property which he had deeded to another under a secret trust. He cannot be heard to complain if he is left where he has placed him-self under such circumstances. Grider v. Graham, 7 Ky. (4 Bibb.) 70; Wright v. Wright, 12 Ky. (2 Litt.) 8. As stated by Judge Robertson in Norris v. Norris' Adm'r, 39 Ky. (9 Dana) 317, 35 Am. Dec. 138: ''In such a case, the law will not be the instrument of its own subversion, and to every invocation of its assistance, replies '*in pari delicto, portior est conditio defendentis*' '' (where both parties are equally wrong the defendant has the better position).

In Shamo v. Benjamin's Adm'r, 155 Ky. 373, 159 S. W. 798, 800, a brother had title to some property placed in his sister, who executed a fictitious note to him for the purpose of defeating a threatened action by his wife on a claim for alimony. He sought a reconveyance of the property from his sister's estate, which was denied, this court saying:

''It is contrary to public policy that one should undertake to defeat a claim about to be asserted against him through the machinery of the law by conveying his property in secret trust to another. In such a case the courts will leave the party exactly where he has placed himself. Whether or not plain-tiff's wife had a just claim against him is immaterial. . . . The transaction involves moral turpitude in the intention with which it is done. The doors of the court are closed to one so offending. As has been frequently said upon this subject, 'he who doeth fraud may not borrow the hand of the chancellor to draw equity from the fountain his own hath pol-luted.' Carson, etc., v. Beliles, 121 Ky. 294, 89 S. W. 208, 28 Ky. Law Rep. 272, 1 L. R. A. (N. S.) 1007; Lankford v. Lankford (Ky.) 117 S. W. 962; Coleman v. Coleman, 147 Ky. 383, 144 S. W. 1, 39 L. R. A. (N. S.) 193.''

Passing over intervening cases applying this prin-ciple, we may cite the later ones of Fears v. United Loan & Deposit Bank, 172 Ky. 255, 189 S. W. 226; Mounts v. Charles, 187 Ky. 421, 219 S. W. 184; Thompson v. Thomp-

son, 188 Ky. 811, 224 S. W. 350; Damron v. Call, 225 Ky. 150, 7 S. W. (2d) 1069.

The foregoing statements and decisions are rested upon facts and conditions showing the participating parties to have been of equal guilt. An exception to this wholesome rule is recognized by the courts where it is made clear that the grantors, although *in delicto,* were not *in pari delicto,* with the grantees. Where there are different degrees of guilt as between the parties to the fraudulent or illegal transaction, as where the grantor has acted under circumstances of oppression, imposition, undue influence, or duress, or at. a great disadvantage with the other party concerned, so that his guilt appears subordinate or less than that of the grantee, the court will grant relief. Thus it is said in Cook v. Colyer's Adm'r, 41 Ky. (2 B. Mon.) 71:

> "The salutary principle of equity, now urged in bar of Cook's right to relief, should not be extended beyond the reason and policy which dictated it; and it does not, therefore, necessarily apply to a case in which the defending party had himself first conceived the fraud for his own benefit, and either by his artifice or influence induced the complaining party to concur with him in the attempted collusion."

This case has its analogue in Harper v. Harper, 85 Ky. 160, 3 S. W. 5, 6, 8 Ky. Law Rep. 820, 7 Am. St. Rep. 583. An avaricious son falsely and fraudulently represented to his aged and widowed mother, who reposed absolute confidence in him, and induced her to believe that she was about to be sued for slander which would result in the loss of all her property, and thus procured her to execute deeds to himself of all her property, ostensibly to protect her, but in fact to obtain the estate for himself. Upon a suit by her to recover the property, the son urged that she must be turned out of court because it was an effort to defeat the law to which she was a party. The answer to this contention is so pertinent to the similar argument made in this case, we freely quote from it:

> "It is true that in cases of executed contracts, if the parties be *in pari delicto,* they will be left where they have placed themselves. They do not come into court with clean hands. If, however, one

party is but an instrument in the hands of the other, then they are not *in pari delicto.* Judge Story says: 'One party may act under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age, so that his guilt may be far less in degree than that of his associate in the offense.' In such a case they are perhaps *in delicto,* but not *in pari delicto.* The act may, indeed, be substantially that of the one party. Thus the law forbids the payment of usury; but, if the borrower seeks for relief, it will be afforded, or, if he has paid it, he may recover it back. The rule *particeps criminis* does not apply. He is not *in pari delicto.* He is the slave of the lender—is *in vinculis,* and must submit to his necessities.

"A court of equity will interpose and set aside an instrument, as between the parties to it, although it was intended to defeat the law, if the parties did not stand upon an equal footing, and if the one influenced and controlled the conduct of the other; and, when a relation of trust and confidence exists, the party in whom it is reposed, and who has obtained a benefit, should show an undoubted right to it. The onus is upon him to make it appear that the transaction was fair and proper, and relief will not be denied to the one least in fault, if he has been led into it in violation of confidence, and by exciting false alarms or fear of legal consequences. If the mind of one of the participants in the transaction exercises an undue influence over that of the other, whether by imposition or threats upon the one side, and confidence or weakness upon the other, equity will grant relief to the latter. Even if the party had sufficient capacity to contract, yet if, through trusting confidence, the other has led him into the illegal act, and then imposed upon him, such relief will not be refused."

See, also, Louisville Insurance Company v. Hoffman (Ky.) 50 S. W. 979, and Fears v. United Loan & Deposit Bank, supra.

Under the facts of this case, as we have decided them to be from the evidence, it appears that the appellees, who are illiterate and uninformed were terrorized and sub-

jected by the appellant to a persistent intimidation; his vicious scheme being climaxed with the fraudulent and untrue representation that their lawyers, on whom they relied, and who were worthy of their utmost confidence, had advised such procedure. In their dismay and consternation, they seized upon the avenue of escape and the opportunity to save their home thus presented to them by their older brother and brother-in-law, in whom they trusted. When it subsequently developed that their fears were unfounded, this brother failed to keep his promise to return to them title to their property. He then filed this suit to evict them from their home. To permit him to accomplish this and to let this deed stand would be unconscionable, and would commend and reward rather than condemn and punish covetousness, deceit, and fraud of a vicious type.

The holding of the lower court denied him this desire, and its judgment is affirmed.