## Addison et ux. v. Wilson et al.

(Decided February 3, 1931.)

144

HARDY & HARDY and MOORMAN, WALLS & BEARD for appellants.

J. R. LAYMAN and J. R. ESKRIDGE for appellees.

OPINION OF THE COURT BY JUDGE WILLIS—Reversing.

L. D. Addison and his wife, Alice S. Addison, sued Leonidas Wilson and wife, Wm. A. Fleming and wife, W. H. Brown and wife, R. R. Houston and wife, and the Breckenridge Bank of Cloverport, seeking to secure equitable relief. Wilson, by answer and counterclaim, sought to obtain certain relief against the Addisons. The circuit court dismissed the action of the plaintiffs, and granted in part the relief sought by Wilson. The plaintiffs have prosecuted an appeal. A full statement of the facts is necessary to a fair understanding of the case.

It appears that a written contract, dated September 24, 1928, was executed by Wilson and Addison, and witnessed by Brown and Houston. It provided for an exchange of properties.

Wilson agreed to transfer to Addison 126 lots in Dayton, Ohio, free of all incumbrances, except a blanket mortgage for $23,000, and the taxes and assessments due and payable in December, 1928, and thereafter. Addison agreed to exchange for the lots his farm of 243 acres situated in Breckenridge county, free of all incumbrances, except taxes due and payable in December, 1928. The contract covered also the crops, chattels, farm machinery, horses, and mules, all hogs, shoats, and poultry, and all improvements, including the machinery in a flour mill, all of which were to go with the farm to Wilson.

Wilson further agreed to purchase at the invoice price a stock of goods then in Addison's store, located on

the farm. The invoice was to be taken by two persons, one to be selected by, and to represent, each of the parties. The invoice was to be based upon current market values. Wilson covenanted in the contract to pay in part for the stock of goods by a second mortgage for $10,000, bearing 7 per cent. interest, payable in eighteen months, upon a garage building in Dayton, Ohio. The first mortgage thereon was for $13,500, and it was recited in the contract that it would be due in eighteen months from the date of the deal. The excess of the invoice price of the stock of merchandise, above the $10,000 represented by the second mortgage, was to be paid by Wilson in cash. The deeds of exchange of the lands and bills of sale for the personalty were to be passed within two days from the date of the contract. The invoicers were to be selected not later than three days from the day of the deal.

The bill of sale for the stock of goods and the second mortgage for $10,000 were to be put in escrow. The contract closed with the statement: "Both parties to this contract are making this deal after seeing and inspecting all property involved therein."

A deed dated September 24, 1928, from William A. Fleming and Ella Fleming, his wife, to L. D. and Alice S. Addison, purported to convey 126 lots described by number and by reference to the revised plat of the city of Dayton, Ohio. The signatures of the Flemings to the deed were witnessed by W. H. Brown and Charles Johnson, and it was acknowledged before Wm. W. Rosson, a notary public of Hamilton County, Ohio. The deed was lodged for record on October 13, 1928, and recorded two days later.

A note for $10,000, dated at Indianapolis, Ind., September 25, 1928, payable on or before eighteen months after date to L. D. Addison and Alice S. Addison, with interest at 7 per cent., payable semiannually bore the names "William A. Fliming" and "Ella Fliming." The signatures to the note are not witnessed. A mortgage from "William A. Fleming and Ella Fleming, his wife," to L. D. Addison and Alice S. Addison to secure the sum of $10,000, covering the garage property in Dayton, Ohio, and bearing date of September 25, 1928, was signed with the same names and the same erroneous spelling as appeared on the note. It was witnessed by Henry Miller and "Laura Whie," and acknowledged before "R. L. Mosley," a notary public of Marion county, Ind.

It was lodged and recorded on the same dates as was the deed from the Flemings to the Addisons. It developed that the notary's name was also misspelled, and the name of the witness, Laura Whie, is a peculiar one, unless it was intended for "Laura White," in which event it also was misspelled.

A deed from Irene Mae Wilson and her husband, Leonidas Wilson, to Wm. A. Fleming, bearing date August 10, 1928, purported to convey the same garage property covered by the mortgage from the Flemings to the Addisons. The deed is on a printed form, and the blanks and the description are filled in script. The handwriting, apparently, is that of Leonidas Wilson. The signatures are witnessed by W. H. Brown and James Jackson, and the acknowledgement is certified by "R. L. Mosley," a notary public of Marion county, Ind. The notary's name was again misspelled. The certificate is also dated August 10, 1928, but the deed was not lodged for record until October 26, 1928. It was recorded three days after it was lodged.

The Addisons on September 26, 1928, conveyed to Leonidas Wilson the Breckenridge county farm mentioned in the contract, and executed a bill of sale for the personalty. When the transaction was about completed, Houston claimed that he had been acting as agent for the Addisons, and induced L. D. Addison to give him several notes aggregating $3,100 to compensate him for his services. The amount was arrived at by calculating a commission of 5 per cent. upon an assumed value of $62,-000, which was represented to Addison to be the amount received by him in the exchange.

The Breckenridge Bank of Cloverport was alleged to have some interest in the personal property granted to it by Leonidas Wilson, subsequent to the transfer of the Addison property to him.

When the invoice of the stock in the store was completed, it was turned over to the defendants, and Wilson paid Addison $200 by check and gave a promissory note for $615, due in ninety days. The total invoice price of the merchandise in the store exceeded by $815 the amount of the second mortgage executed by the Flemings.

This action was filed on November 2, 1928, to rescind the entire transaction, to cancel all deeds, notes and transfers, and to restore to the respective parties the properties exchanged.

The pleadings are voluminous, but, reduced to their essence, they present a claim of conspiracy on the part of the defendants to defraud the plaintiffs of their property by means of falsehood, misrepresentations, concealment, and persausion, and its complete accomplishment and full consummation. Wilson counterclaimed that he had been defrauded in two particulars. The first claim was that a small tract of land included in the contract had been omitted from the deed, and the other was that the invoice price of the stock of goods had been padded to the extent of $1,189. He sought recovery of the $200 cash payment and cancellation of his $615 note. He sought to recover also the sum of $374, by which sum Addison's mortgage from Fleming exceeded the actual invoice price of the stock of goods. The circuit court, as already stated, dismissed the action of the Addisons, and granted Wilson relief to the extent of canceling his note for $615 to Addison, and rendering a judgment against Addison for the items of $200 and $374. Wilson was denied the right to recover the small tract of land which was not included in the contract or the deed.

The case for the plaintiffs rested upon the charge of a conspiracy among the defendants to defraud them out of their property, and its consummation by unlawful and unfair means. The defense, in its last analysis, depended upon the genuineness of the asserted agency of Houston for the Addisons. If Houston acted as an agent of the alleged conspirators, it is plain that the plaintiffs' case was completely made out; whereas, if the Addisons were defrauded by their own agent, without the knowledge, procuedment, or acquiescence of Wilson and Brown, the circuit court committed no error in denying a rescission of the contract and in refusing a restoration of the respective properties exchanged.

Wilson lived in Cincinnati, and Houston in Findlay, Ohio. Brown lived in Indianapolis, Ind. All were real estate dealers of a kind not exactly regular. None of them were licensed or members of the realty organizations in the localities where they operated. None of them maintained regular offices. None of them knew Addison, although Brown had some information about his location and holdings. They were acquainted with each other, and had been associated at least to some extent. The meeting of the three men in Dayton was most casual, but they immediately "got up a deal" and embarked for Addison, Ky., to see if they could get appellant's prop-

erty. Houston says he learned of the property and of Addison's desire to dispose of it through Zens, a Cincinnati realtor. Brown testified that Houston represented Mrs. Addison's property when he met Brown and Wilson at Dayton; that Houston "put the deal up to Mr. Wilson in Dayton, Ohio."

At the time none of the parties had ever seen Addison, and any deal then "put up" was necessarily a venture of their own. The three approached Mrs. Addison, when her husband was away, and stated that they wished to acquire her property. She owned the farm, while the store belonged to Mr. Addison. She advised them that the price was $60,000, of which $10,000 had to be in cash. The Addisons had been offering to sell or exchange their holdings and had agreed to ask that price. They thought the stock of goods in the store would invoice at least $20,-000. There was no quibbling over terms or haggling over prices. The property and the price was satisfactory, although the strangers had made no examination of its quality or productiveness, or any investigation of its history, or any inquiry as to prices prevailing in that locality. They told Mrs. Addison to get her husband as soon as possible. He came from Louisville at the earliest opportunity. The visitors arranged at once to take him to Dayton, Ohio, not to sell his property, but to induce him to accept what they had to offer in exchange for it. Addison was an elderly man, in impaired health, and had recently been a patient in a psychopathic sanitarium. Brown drove the car, Houston paid the expenses, Wilson was in the party, and one of them testified that Mr. Addison, according to his own admission, had a most pleasant and enjoyable journey. They took him to Cincinnati and exhibited an unattractive proposition, which naturally did not appeal to Addison. Probably it was not expected to do so. They proceeded to Dayton, a thriving city where many attractive sights were shown him. He was left alone for a few minutes in a hotel, when a mysterious stranger approached him, ostensibly to trade for the lots he was about to acquire. Wilson, conveniently near so Addison could overhear, talked into a telephone to the effect that he was not then free to sell the lots, as he was on another deal. Addison was shown large factories, developed subdivisions, and stimulated by glowing representations and assurances. He was not told several important facts, however, that he discovered later. He was not introduced to anybody in Dayton who

could tell him the facts. The McCall factory was near the 126 lots, and the fact was emphasized. But Addison was not advised that the factory employed only white labor, whilst the 126 lots had been converted into a colored subdivision by the sale of lots to colored people, some of whom lived upon it. Its desirability was thus practically destroyed, and the salability of the lots greatly impaired. Addison was not advised of the unhappy results of previous efforts to sell the lots.

Addison was hustled out of town, and, while stopping overnight in Cincinnati, was induced to sign the contract with Wilson.. It was dictated by Houston. When Addison got home, he was under the spell of his adversaries, and was hurried into consummating the exchange. He chose his niece to assist in making the invoice; Wilson chose Houston to represent him. Each also got a man familiar with current prices. The invoicers finished their work, and the store was turned over to Wilson. But Wilson, Brown, and Houston participated in the division of the property obtained from Addison. Houston brought some of his family there to help put the store in order. He shipped out some of the goods, for which he generously allowed a credit on Addison's note. Brown got all the chattels on the farm, listed by Addison at over $4,000. Wilson tried at once to make a resale, and priced the property at a substantial advance over the price that had been fixed by the Addisons. Houston set up a claim for compensation, and induced Addison to give his notes for sums aggregating $3,100. Yet Houston continued to assist Wilson and remained active about the business for several days. Wilson says Brown was his agent, and the property he got was to pay for his services. But Brown swears he did nothing to induce Addison to make the contract. It is not reasonable to suppose that such a large sum would have been paid Brown for the mere use of his automobile and his services as driver. If Houston had been acting as agent for Addison, he would have been through when the contract was signed, and yet he remained on the job, rendered services to the purchaser, and received a portion of the property. More than that, he brought members of his family there to help. He acted openly for Wilson in taking the invoice, and calmed all opposition that Addison manifested during its progress. Wilson needed no persausion; he was eager for the trade.

The concert of action on the part of Wilson, Brown, and Houston was perfect. They worked together in unbroken unison. The object the three men had in mind from their first meeting at Dayton was the acquisition of the Addison property. They all worked to accomplish that purpose. The one thing needed was to induce Addison to accept what Wilson was offering in exchange, and the three worked assiduously and rapidly to that end. They swear they believed all the representations they made, but certain facts cogently contradict that claim. The subterfuge resorted to by Wilson to avoid signing the $10,000 note and mortgage stamps the whole transaction as a transparent fraud. Fleming was Brown's brother-in-law, and hopelessly insolvent. Wilson naively swore that he resorted to that expedient because he did not deem it wise ''to be in back of every mortgage that is on every property that you are to take title to.'' Fleming admits that he was paid for his part in the transaction. Strong indications of forgery in connection with the Fleming transaction appear, but, taking the claim of Wilson at its face, it demonstrated that he knew Addison was being defrauded. He was forestalling the after effects which he expected to follow. In January, 1930, after this action was filed, and when Wilson and his associates had the motive of self-interest to protect themselves, the garage property was sold at public auction for the amount of the first mortgage, and the 126 lots were sold, in the same public manner, for less than the first liens against them. We do not overlook the opinion testimony adduced to sustain the valuation placed upon the property by Wilson. But it was met with countervailing evidence of much greater probative value. It is demonstrable from all the evidence that the value was not there, but it is not necessary to spend time upon that question. The companionship, co-operation, and concert of action of Wilson and his associates to the predetermined end of acquiring all of Addison's property in exchange for Wilson's overburdened assets is too plain to require a meticulous inquiry into relative values. The manner of handling the transaction established that Wilson, Brown, and Houston knew the value was not there, and that it was necessary to fix it so that Wilson, who was to take title to the property in Kentucky, would be under no personal liability. Again, in defending this action, the defendants have aided each other in every

way possible, and have continued in league to hold the gains acquired from the Addisons.

The evidence discloses many tracks of the conscious fraud perpetuated by these defendants. The trail of the serpent is over it all. The contract itself contained a declaration designed to be invoked as a defense to anticipated actions or accusations. It was declared that the deal was made after both parties had seen and inspected all property involved in the trade. The precaution stamped the traders as formalists with appreciation of the value of surrounding the transactions with at least some semblance of fairness. Turner v. Hammock, 229 Ky. 836, 18 S. W. (2d) 285.

Moreover, as a sort of insulation against the shock of disclosure they knew was sure to follow, the defendants had prepared and executed a remarkable document certifying:

"Whereas, we have this day consummated an exchange of property and merchandise, be it known that both parties to this deal have made said exchange upon their own inspection of property and merchandise placing their valuations of same, and that both parties are absolutely satisfied with all details connected with same."

That certificate was a confession in advance that defendants would need some fortification against an expected attack on their transaction. It is a common practice of sharp traders, but it does not deceive the courts. Parish v. Casner et al. (Mo. Sup.) 282 S. W. 392; Stonemets v. Head, 248 Mo. 260, 154 S. W. 108, 113; Barnett et al. v. Cobb et ux., 140 Wash. 538, 250 P. 57; Gordon v. Hillman, 91 Wash. 490, 158 P. 96; Deiterich v. Rice, 115 Wash. 365, 197 P. 1; Western Mfg. Co. v. Cotton & Long, 126 Ky. 749, 104 S. W. 758, 31 Ky. Law Rep. 1130, 12 L. R. A. (N. S.) 427.

In the case of Stonemets v. Head, supra, the facts were analogous to those shown in this case, and the opinion by Judge Lamm contains an elaborate and interesting discussion of the principles governing the disposition of controversies of that character. The discussion is too extended for quotation here, but the reader will find himself fully compensated for the time required to read it all.

In Parish v. Casner, supra, the same questions were further elaborated, and Commissioner Seddon added even to the classical allusions of Judge Lamm.

A conspiracy may be shown by circumstantial evidence, by the acts or declarations of the conspirators, or by the cumulative effect of concerted action of the several parties concerned. 5 R. C. L. sec. 53, p. 1103; 12 C. J. sec. 231, p. 638.

In State v. Ripley, 31 Me. 386, it was said:

"It is often, that the intentions of a wrongdoer are ascertained entirely by acts done, which are the natural effects of unlawful designs; the acts and circumstances which accompany them, showing the connection between the acts, and the motives which produced them, are generally the most convincing evidence which can be adduced."

When individuals associate themselves together in an unlawful enterprise, any act done in pursuance of the conspiracy by any of the conspirators is in legal contemplation the act of all. Metcalfe v. Conner, Litt. Sel. Cas., 497, 12 Am. Dec. 340.

The mind of each being intent upon a common object and the energy of each being enlisted in a common purpose, each is the agent of all the others, and the acts done and words spoken during the existence of the enterprise are therefore the acts and words of each and all. Commonwealth v. Campbell, 7 Allen (Mass.) 541, 83 Am. Dec. 705; U. S. v. Gooding, 12 Wheat, 460, 6 L. Ed. 693; Nudd v. Burrows, 91 U. S. 426, 23 L. Ed. 286; Logan v. U. S., 144 U. S. 263, 12 S. Ct. 617, 36 L. Ed. 429; Page v. Parker, 43 N. H. 363, 80 Am. Dec. 172.

We are constrained to the conclusion that Wilson, Houston, and Brown conspired to defraud the Addisions out of their property, and by concert of action, fraud, misrepresentation, and unfair dealing, consummated the purpose. Cf. Whiteside v. Murphy, 174 Ky. 583, 192 S. W. 632.

The sole basis for the contention that Houston was the agent of the Addisons is the execution by Addison of notes to Houston for commissions on the deal. These notes were obtained by fraud by one of the conspirators as a part of the conspiracy, and no consideration existed for such a payment or promise to pay. Houston was not employed by Addison. He did nothing for him. Gudgel v. Cook, 146 Ky. 439, 142 S. W. 1014. He actually worked for Wilson, and was in league with him. Addison had no need of an agent to sell his property. The defendants were eagerly seeking it, and the whole problem and

purpose was to get Addison to take Wilson's holdings in exchange. Houston, in fact, worked against the interest of Addison. The afterthought that he was an agent for Addison was resorted to as a means of acquiring still more property from that feeble old man. Nothing of the kind was ever mentioned to Addison until after the contract was made and carried into effect, and both Mr. and Mrs. Addison were surprised, and reminded Houston that he had been working for Wilson, and that they had considered Wilson, Brown, and Houston as partners in the transaction. But the old gentleman, as he pathetically remarked, "had perfect faith in all three of the men and thought what they said was actual truth from the beginning to the end." He never suspected any of them until his eyes were opened by some friends in Louisville, who explained to him that he had been grossly defrauded. The obtention of the notes from Addison was the climax of the fraud, and the crowning evidence of the trusting confidence of the old gentleman, as well as proof of the fraudulent purpose of the defendants. It showed that he was, not only the object of the conspiracy, but a victim of it. People v. Gilman, 121 Mich. 187, 80 N. W. 4, 46 L. R. A. 218, 80 Am. St. Rep. 490.

The notes given to Houston fall with the structure erected by the conspirators, and, if they have been negotiated to innocent holders, all of the conspirators are liable to Addison for the amount thereof. Wisner v. Carter, 117 Wash. 623, 201 P. 918.

But it is argued that even false representations as to value do not affect the sanctity of a sale when the purchaser inspects the property and can decide for himself. Cole v. Young, 167 Ky. 600, 181 S. W. 177; Culton v. Asher, 149 Ky. 659, 149 S. W. 946; Va. Iron, Coal & C. Co. v. Crigger, 179 Ky. 748, 201 S. W. 298; Livermore v. Middlesborough Town-Lands Co., 106 Ky. 161, 50 S. W. 6, 20 Ky. Law Rep. 1704; First National Bank v. Mattingly, 92 Ky. 657, 18 S. W. 940, 14 Ky. Law Rep. 68; German Nat. Bank v. Nagel, 82 S. W. 433, 26 Ky. Law Rep. 751; Smith v. Bank, 85 S. W. 219, 27 Ky. Law Rep. 410.

These authorities, and others referred to in the opinions, support the proposition that, when parties deal at arm's length, when there is no relation of trust or confidence between them, and no representation or statement that would have a tendency to deceive or mislead, and there are no special circumstances imposing a duty

to speak, mere silence or nondisclosure of facts within the superior knowledge of one of the parties will not amount to such fraud as would authorize a rescission of the contract, or justify a denial of relief thereon; and statements of the value of property constituting mere expressions of opinion ordinarily are not actionable. Yet the rule is otherwise where the misrepresentation relates to some specific extrinsic fact which materially affects the value, and which is peculilarly within the knowledge of the vendor, and is made with knowledge of its falsity, or what the law regards as equivalent thereto, with the intent that the buyer should act in reliance upon it. And, when the property is located in a remote or strange locality, and the vendor knows the buyer has not investigated properly or learned the facts, and there is fraud and conspiracy attending it, the courts will not permit the wrong to be accomplished, no matter how formally it may be clothed or how carefully the tracks may be covered. Caumiser v. Conley, 60 S. W. 375, 22 Ky. Law Rep. 1237; Adler v. Yager, 215 Ky. 678, 286 S. W. 983; Browning v. Moseley, 182 Ky. 96, 206 S. W. 168.

The law is thus stated in 23 C. J. p. 193, sec. 18:

"A party who relies on his own judgment cannot claim that a fraud was practiced on him. As a general rule a party who makes an independent investigation as to, or inspection of, the real or personal property to be received by him, and does not rely on the representations of the other partner, cannot avoid the contract on the ground that such representations were false and fraudulent. But it has been held that the mere fact that a person to whom false representations have been made makes inquiry as to, or an examination of, the property to be received by him does not conclusively show that he did not rely on such representations. A party to the contract cannot escape responsibility for his false statements where the conditions and circumstances are such as to render it practically impossible for the other party to obtain the necessary information by his examinations, or where the guilty party prevents or induces the other party to refrain from a full and complete examination."

It is further argued that the doctrine of clean hands applies to this case, and precludes the appellants from relief in equity. That doctrine is founded in sound

morality, and is established by many decisions. Carson v. Beliles, 121 Ky. 294, 89 S. W. 208, 28 Ky. Law Rep. 272, 1 L. R. A. (N. S.) 1007; American Association v. Innis, 109 Ky. 604, 60 S. W. 388, 22 Ky. Law Rep. 1196; Dunscombe v. Amfot Oil Co., 201 Ky. 290, 256 S. W. 427.

The facts claimed by the appellees to call for the application of that doctrine are that the Addisons conspired with Houston, or consented for him to raise the amount of the invoice of the stock of goods. When the invoice was taken, Houston made a record for Wilson, whilst a niece of appellants made a similar list for them. Their niece had stated that the total invoice price exceeded $11,000, and appellants felt they had been treated badly in valuing the goods even at that price.

The niece had gone away and did not remain until the matter was completed. Mr. Addison was still more disappointed when he discovered that the total invoice did not amount to as much as had been indicated by his niece. Mrs. Addison did not know what the exact total was, and thought that the amount which Mr. Houston agreed to allow as the invoice price was really less than the amount due, being approximately $11,000, she consented to accept it. Mr. Houston was then openly representing Mr. Wilson, and naturally Mrs. Addison assumed that what he did was satisfactory to his associates. No intent or purpose to deceive or defraud Mr. Wilson or any one else was shown. Mr. Addison testified that he was not entirely satisfied with the invoice, and that many of the prices were lower than they should be, but, when he objected to certain valuations, Mr. Houston always agreed for them to be raised in order to keep him contented.

His niece had made up a record of the figures for him, and he had them added at the bank. Mr. Houston himself changed the figures, and did it to meet the objections of Mr. Addison. They did not even then reflect the full value of the goods. The complaint on the part of Addison about the figures brought the concession from Houston. Plainly the facts do not justify the argument advanced, and it would be unfair and inequitable to deprive Mr. Addison of his property for the simple reason that he permitted one of his adversaries to make an arbitrary addition to an invoice when he thought the addition was entirely justified by the facts. The facts, in any view of the matter, were wholly inadequate to

deprive appellants of the right to obtain equitable relief from the results of the gross fraud perpetrated upon them respecting the entire transaction. Harper v. Harper, 85 Ky. 160, 3 S. W. 5, 8 Ky. Law Rep. 820, 7 Am. St. Rep. 583; Fears v. United Loan & Deposit Bank, 172 Ky. 255, 189 S. W. 226; Coffey v. Coffey, 232 Ky. 179, 22 S. W. (2d) 589.

The appellants did all they could to restore to the appellees what they had received, and tendered full restitution with the petition, which, under the circumstances, was all that was required of them. Chaffee v. Raymond, 241 Mich. 392, 217 N. W. 22; Garrett v. Butler (Tex. Civ. App.) 260, S. W. 1069; Southeastern Land Co. v. Jonnard, 198 Ky. 504, 249 S. W. 789; Ross v. Oliver Bros., 152 Ky. 437, 153 S. W. 756.

It is insisted that the finding of the chancellor upon the facts was based upon conflicting evidence, and should not be reversed by this court. The question of fraud is compounded of law and fact, and, notwithstanding the great confidence reposed in the chancellor's finding of fact, it is the duty of this court to read the record for itself, and, if such reading results in a clear conviction as to how the case should be decided, it is the duty and province of this court to render the correct judgment. Turner v. Hammock, 229 Ky. 836, 18 S. W. (2d) 285; Ford v. Ford's Ex'r, 233 Ky. 673, 26 S. W. (2d) 551.

It is only when the court, on the whole record, entertains serious doubt as to the correctness of a chancellor's conclusion, that it is not disturbed. Martyn v. Jacoby, 223 Ky. 674, 4 S. W. (2d) 684; Tackitt v. Newsom, 186 Ky. 188, 216 S. W. 376; Jacobs' Ex'r v. Meyers, 185 Ky. 594, 215 S. W. 532.

The circuit court should have rendered a judgment restoring to Mrs. Addison the real estate conveyed to Wilson, compelling the defendants to account to the plaintiffs for the personal property received and converted by them, and to return the stock of goods and the store, canceling the notes executed to Houston, and requiring the defendants to accept the restitution tendered. The counterclaim of Wilson should be dismissed.

The judgment is reversed, with direction to render a judgment consistent with this opinion.

Whole court sitting.